UNITED STATES of America,
Plaintiff-Appellee,

v.

Edward E. REICIN, Defendant-
Appellant.

No. 73–1057.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1973.

Decided May 28, 1974.

Rehearing En Banc Denied June 27, 1974.

Thomas P. Sullivan, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty.. Thomas R. Mulroy, Jr., Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and FAIRCHILD and PELL, Circuit Judges.

PELL, Circuit Judge.

An eleven-count indictment charged appellant Edward Reicin, an attorney, with mail fraud, 18 U.S.C. § 1341.[1] De-

---

1. The statute provided:
"§ 1341.　Frauds and swindles.
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

fendant and Dr. William Becker allegedly had devised and carried out a scheme to defraud insurance and other companies[2] in personal injury cases by preparing and submitting false and exaggerated medical reports and bills to the companies and by causing claimants "to absent themselves from employment to increase their alleged damages." Each count pertained to a different personal injury case handled by the defendant or lawyers in his office, and each count alleged a specific mailing with regard to the claim involved in that count.[3]

A jury convicted Reicin on Count 9, which concerned the mailing of a fraudulent document to the Royal Globe Insurance Company, and acquitted him of the ten other counts. On this appeal, defendant seeks (1) the reversal of his conviction on the ground of insufficiency of the evidence, or (2) a remand for a new trial on Count 9 because of supposed procedural irregularities at trial. Reicin also requests a remand for a hearing on his motion to quash the indictment.

### Factual Background

Count 9 concerned the claim of Philip Eauslin, a traveling commission salesman, whose automobile was struck from the rear by a truck on July 5, 1967. A few days after the accident, Eauslin and his family drove the repaired automobile to Florida for a previously planned vacation. While in Florida, Eauslin felt pain in the small of his back. He had experienced such pain sporadically for some years prior to the July 5th acci-

dent. As he had orginally intended, Eauslin remained in Florida for two weeks, during which time he did not seek the services of a doctor.

After returning from vacation, Eauslin mentioned the accident to his supervisor at his place of employment. That individual recommended that Eauslin consult the defendant, whose firm had done some work for the company. Eauslin did so. In his conversation with Reicin, he told him about the accident and said that, although he had some discomfort, he probably had had the same symptoms before the accident. He also mentioned that he had just returned from a vacation trip to Florida. Reicin suggested that he see a doctor; when Eauslin replied that he had no family physician, defendant arranged for him to see Dr. Becker.[4]

Eauslin testified that he visited Dr. Becker's office only one time and that the doctor briefly examined Eauslin's back but gave him no treatment or medication. He also sent him to an X-ray clinic.

According to Dr. Becker, after Eauslin had come to his office, defendant telephoned the doctor and requested the card on which Becker had listed the number of visits supposedly made by Eauslin. Reicin had stated that he wanted the card because there was a subpoena for Becker's records and defendant wanted to make certain that the cards "looked all right." Dr. Becker's bill for treatment of Eauslin amounted to $185 and falsely indicated that Eauslin had seen the doctor eleven times.

---

2. Each count involved a different mailing; however, one scheme and artifice to defraud various companies was charged, "including but not limited to: Aetna Insurance Company, Allstate Insurance Company, Chicago Transit Authority, The Hanover Insurance Group, Horace Mann Insurance Group, Inter-Insurance Exchange of the Chicago Motor Club, National Emblem Insurance Company, Northwestern Security Insurance Company, Royal Globe Insurance Company and Unigard Insurance Company . . . ."

3. The use of the mails aspect of the case has not been challenged on this appeal.

4. At the time of Reicin's trial, Dr. Becker, the Government's primary witness, had been convicted of mail fraud. He had prepared false medical bills and reports and had sent them to divers attorneys so that they could obtain inflated settlements from insurance companies. Becker was given two years' probation with the understanding that he tell the truth in any further proceedings regarding the mail fraud cases in which he had participated.

Becker refunded 25 percent of the bill to the defendant in cash.

Count 9, like Counts 2–8 and 10 and 11, realleged by reference all the allegations of the first count, which described one scheme or artifice to defraud.[5] The evidence adduced at trial established the following course of conduct. Dr. Becker had known the defendant since 1961, and between 1965 and 1969, he handled approximately 83 to 90 cases with Reicin. He testified that he looked to the defendant for payment of some of the medical bills involved in the indictment. Prior to sending each of the bills to Reicin, Dr. Becker would receive a letter from the defendant asking for the bills.

After Reicin would pay the bills, the doctor would kick back 25 percent of each payment to the defendant. Dr. Becker testified that each of the bills and medical reports he had prepared was false and exaggerated and that he had had conversations with the defendant about their inaccuracy. Reicin had expressed concern that the fraud might be exposed: "[T]here was a lot of heat in the streets" and "[there were] investigations going on about personal injury cases."

Although Reicin voiced concern about the discrepancy between the number of visits mentioned on the bills and the actual number of visits that claimants paid Dr. Becker, he neither warned the various companies about the misinformation nor ceased sending clients to Dr. Becker for examination for insurance claim purposes. Indeed, Becker testified that in 1965, after Reicin had told the doctor that he was worried that the medical bills smacked of fraud, Reicin simply suggested that the manner of his payment be changed. Previously, Reicin would send Becker 40 to 60 percent of the amount of the bill. Reicin proposed that he would send the doctor the full amount of the bill by his, Reicin's, check and thereafter Becker would refund 25

percent of the amount in cash to Reicin. Apparently because of the increase of the percentage to the doctor, he was to pay the resultant income tax based on the full amount of the bills. Further, Dr. Becker also testified that the defendant had demanded that certain claimants-patients be hospitalized.

Former clients of Reicin, claimants, corroborated much of Becker's testimony about Reicin's pattern of behavior and his knowledge that the reports submitted to the various companies contained misrepresentations. For example, client Carolyn Lovell stated that she had told Reicin that if she went to the hospital she might lose her job. Reicin replied that she was "working for peanuts anyhow" and that she should go to the hospital. He telephoned a Dr. Villate and told him to "throw Mrs. Lovell in the hospital." After Reicin gave Mrs. Lovell her settlement, he warned: "[N]ot a word of this to anyone. If anything happens, come to me." When claimant Carrara, after signing the settlement agreement, questioned the amount of the doctor's fees, defendant replied that it was normal for ten or twelve visits. Carrara stated that he had visited Becker only once or twice. Reicin then responded that, nevertheless, "that is what we used in the settlement."

At the close of the Government's case, the trial court struck paragraph 10, concerning "lost time," from Counts 3, 4, 5, 6, and 10. However, the court denied the defendant's motion for judgment of acquittal on Count 9 or, in the alternative, .that paragraph 10 be stricken in relation to Count 9.

### Sufficiency of the Evidence

#### Claimed Total Failure of Proof

Reicin first contends that the Government produced no evidence, direct or indirect, that he was aware that Dr. Becker's report and bill on claimant Eauslin were fraudulent. He further maintains,

---

5. Prior to trial, the court struck from the indictment allegations that defendant Reicin had submitted false automobile repair bills

to the various companies and that he had defrauded his clients.

contrary to the district court's position in its post-trial memorandum opinion, that the evidence pertaining to the counts on which he was acquitted may not be the basis for inferences against him on Count 9.

Second, Reicin asserts that the Government failed to prove another element of the scheme as described in the indictment, namely, that Becker and the defendant caused clients, including Eauslin, to absent themselves from employment to increase their alleged damages. The prosecutor, Reicin declares, recognized the weakness of his case in this respect and therefore in his closing argument injected the "new and different [lost time] theory" that, without Eauslin's knowledge, the defendant and Eauslin's employer, Mr. Brill, submitted a letter to the Royal Globe Insurance Company indicating that the claimant had taken off more time than he in fact had. This supposedly material alteration of the indictment assertedly was improper and its substance unproved.

■ This assault by defendant on his conviction stems primarily from his narrow view of a mail fraud charge, a view which we do not share.

"The defendants' arguments [in this mail fraud case] as to sufficiency of the evidence on the substantive counts attack the credibility of witnesses, disregard the fact that guilt can be proven by circumstantial evidence, . . . and generally ignore the function of the jury in criminal trials. Defendants do not, in their briefs, look at the evidence as a whole, or in the light most favorable to the Government but rather isolate various bits of testimony and argue that each was insufficient to support the verdicts. However, the evidence presented concerning the various accidents overlaps and cannot be viewed in a vacuum." United States v. Hutul, 416 F.2d 607, 617 (7th Cir. 1969), cert. denied, 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970).

The jury's acquittal of defendant of ten of the eleven counts charged does not justify the conclusion, as Reicin implies, that the jury perceived no overall scheme but nevertheless irrationally convicted defendant on Count 9. In finding Reicin guilty on that count, the jury, we are persuaded, did look at all the evidence, the approach the Government had adopted at trial. In his closing argument in particular, the prosecutor had developed the theme that Reicin and Dr. Becker had devised a successful formula for defrauding companies in accident cases by inflating the "specials" and that they had employed this preconceived plan repeatedly, only varying it slightly once or twice as the circumstances required. In his analysis of the verdict, the defendant fails to take into account the possibility that the jury might have been exercising "its historic power of lenity." United States v. Carbone, 378 F.2d 420, 423 (2d Cir. 1967), cert. denied, 389 U.S. 914, 88 S.Ct. 242, 19 L.Ed.2d 262. In United States v. Fox, 140 U.S.App.D.C. 129, 132, 433 F. 2d 1235, 1238 n. 22 (1970), the court pointed out "the judicially recognized fact that juries frequently convict on some counts but acquit on others, not because they are unconvinced of guilt, but simply because of compassion or compromise." [6]

---

6. While we decline to speculate as to the reason the jury selected the indictment count involving the Eauslin incident for its sole conviction, we do note certain significance given to this count in the final argument of counsel for Reicin:

"Mr. Hoffman, who is a very fine lawyer and does a good job for the government, he points out to you that the Hernandez incident put Reicin on notice, that there is something wrong with Becker's bills. But he still continued to send clients to Becker.

"Do you know how many of these cases went to Dr. Becker after the Hernandez incident, ladies and gentlemen? One. O-n-e, one, the Eauslin case, where Eauslin came in and he practically fought with him about whether he had a family doctor and Reicin said, 'Go see your family doc-

■ Count 1, which each subsequent count of the indictment realleged, described one scheme or artifice to defraud. Its separate paragraphs were enumerations of certain illustrative elements or characteristic patterns of the scheme. (Count 1 and Count 9 are set out in the Appendix to our opinion.) Count 9 specified one instance of the perpetration of the continuing plan. Dr. Becker's testimony, which Reicin does not credit but which the jury apparently did find persuasive, indicated that the defendant knew that the doctor was regularly falsifying the bills of Reicin's accident clients, including those for Eauslin. His protestations notwithstanding, Reicin continued to refer persons to Becker and to share the monies resulting from that consultation. Reicin's primary concern was that the misrepresentations would be discovered. Becker's testimony and that of the various clients provided an adequate basis for the conclusion that Reicin knew of the misrepresentations, that he and Becker had developed a unitary scheme and had participated in that scheme, and that the two had handled the Eauslin claim in accordance with the established scheme.

Although we find no merit to the claim that there was no continuing, overarching scheme or that Reicin did not participate knowingly in it, we do agree that the Government's inability to establish that the defendant and Becker caused Eauslin to take unnecessary time off from his job weakened the Government's case. The issue is whether the lack of such proof, despite the presence of the other elements of the scheme as alleged in the indictment, vitiates the conviction on Count 9.

■ We hold that it does not. "[I]n most mail fraud prosecutions, there are numerous instances of allegedly illicit conduct, all of which need not be proved to sustain a conviction." Anderson v. United States, 369 F.2d 11, 15 (8th Cir.

1966). *Cf.* Martin v. United States, 404 F.2d 640, 643 (10th Cir. 1968). As the district court stated in its post-trial opinion, "[a]s in a conspiracy case, it is necessary to prove at least one but not necessarily each of the specific acts to sustain each count." This is not a case of a crucial, substantial, prejudicial variation between indictment and proof; defendant and Becker handled the Eauslin claim substantially as they had the other claims, although perhaps their pecuniary goal was a trifle more modest this time.

■ In regard to Reicin's related contention, that the prosecutor in his closing argument substituted a "different lost time theory," we place a different construction on the prosecutor's remarks. Eauslin did not have an exhaustive recollection of his conversations with the defendant or of his work schedule following the accident, but his testimony was sufficiently definite to permit the prosecutor to argue that certain inferences could be drawn from the seeming discrepancy between that testimony and the Eauslin lost-time exhibits. The Government was not limited to proving only those details of the scheme alleged in the paragraphs of Count 1 but could also draw additional inferences from the evidence relevant to the defendant's criminal intent. The jury heard the somewhat equivocal evidence on this point and was free to disregard the prosecutor's assessment of it. We note that Reicin did not object to the argument at the time and that the trial judge instructed the jury that counsel's comments were not evidence.

### Claimed Partial Failure of Proof

Reicin interprets the charge against him as consisting of two "branches": (1) the knowing submission to the Royal Globe Insurance Company of a false medical report and a false bill for the Eauslin claim, and (2) causing Eauslin to be absent from his job in order to in-

---

tor.' And eventually Reicin sent Eauslin to Becker. One case involved here in which Reicin sent a client to Becker after

the Hernandez incident, as you will see when you examine these pieces of paper."

flate his damages. Under this construction of the case, the defendant asserts, in an alternative argument, that if the evidence was sufficient to prove only one "branch," then he is at the very least entitled to a new trial. More specifically, Reicin's argument is as follows: (a) Count 9 was submitted to the jury on alternative grounds (1) and (2), and the jury was instructed · that it could convict defendant under *either* "branch";[7] (b) the Government failed to adduce sufficient evidence against the defendant, the inadequacy particularly apparent as to the lost-time ground; therefore, (c) the general verdict of guilty cannot stand because the jury may have based its verdict on the "obviously" unproven ground.

While what we have already said on the nature of a mail fraud case is probably sufficient to dispose of this secondary argument, we will consider the authorities to which our attention has been directed by Reicin.

He claims to find support in Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), and United States v. Baranski, 484 F.2d 556 (7th Cir. 1973). However, those cases involved a special statutory problem not present here. In each case, there was a basis for belief that the convictions could have rested on statutory sections or clauses which the respective reviewing courts held to be constitutionally invalid. Because the trial courts had instructed the juries that they could convict on the basis of any one of the several statutory bases involved and the juries had returned general verdicts, the grounds for the convictions were unclear; the juries might have convicted under the parts of the statutes which infringed First Amendment rights. In the case at bar, there is no danger that the defendant might have been found guilty for having engaged in conduct that the Government cannot constitutionally prohibit. Further, the challenged portion of this indictment was merely an illustrative aspect of an overall scheme and did not constitute per se a separate offense or separate legal theory.

The defendant also relies on United States v. Groves, 122 F.2d 87 (2d Cir. 1941), cert. denied, 314 U.S. 670, 62 S. Ct. 135, 86 L.Ed. 536, which he characterizes as the "closest [case] on the facts." In *Groves, supra* at 89, the court stated that "[e]ach count of the indictment set forth three separate frauds, alleged to have been practiced on G.I.C. pursuant to the scheme." The court affirmed the conviction of one of the two appellants, but reversed and remanded the case against the second appellant. It ruled that there had been no evidence of that defendant's participation in the second and third frauds. Furthermore, the court disapproved of the use against the defendant of certain "extremely prejudicial" hearsay testimony, upon which, the court noted, the jury might have based its finding of guilt.

We do not find *Groves* persuasive here. If it stands for the broad proposition that each act constituting a part or detail of the scheme charged in a mail fraud indictment, but not essential to the existence of the scheme, must be proved or the entire prosecution fails, then we reject that viewpoint. Whatever the factual situation in *Groves*, the

---

7. The instruction to which Reicin refers (No. 39) provided:

"A scheme to defraud under the Mail Fraud statute means some plan to procure money or property by means of false pretenses or representations calculated to deceive persons of ordinary prudence. It is not necessary, however, that any insurance company was actually defrauded by the scheme. Nor is it necessary that the Government prove every one of the pretenses, representations and acts charged in the indictment. The Government must prove that defendant knowingly participated in such plan, and that such representations were made by him, or his agents, knowing they were false, and with intent to defraud."

Defendant finds the next-to-last sentence of this instruction improper. He had unsuccessfully opposed the giving of the instruction at trial.

present case consists not of a series of disconnected swindles or of frauds that may have had merely a common actor or stage but of a continuing, unitary scheme wherein each participant generally adhered to a certain course of conduct in regard to the various victims. *Cf.* United States v. Sheehan, 428 F.2d 67 (8th Cir. 1970), cert. denied, 400 U.S. 853, 91 S.Ct. 66, 27 L.Ed.2d 90; Bliss v. United States, 354 F.2d 456 (8th Cir. 1966), cert. denied, 384 U.S. 963, 86 S. Ct. 1592, 16 L.Ed.2d 675. In sum, we do not share Reicin's interpretation of the prosecution's case. The Government argued to the jury that Reicin and Becker had concocted one basic scheme; what Reicin labels as "alternative theories" are specifications of the participants' fundamental modus operandi, which they modified somewhat as circumstances warranted.

Notwithstanding defendant's argument to which we have adverted, Reicin agrees in his brief "that it was not necessary for the Government to prove each of the various fraudulent acts alleged in the indictment."

Our conclusion is not changed by the fact that the trial judge declined to strike Paragraph 10 from Count 9, which paragraph was incorporated by reference from Count 1 and which dealt with that part of the general scheme whereby the allegedly injured person absented himself from his place of employment. The trial judge did strike this reference-incorporated paragraph from five other counts. Because it was not necessary for the Government to prove each of the fraudulent acts constituting the scheme to defraud, the striking of the paragraph from some of the counts was an unnecessary action, being nothing more than a judicial comment on factual proof and has no other significance in this particular case. We will not assume that the jury based a verdict on nonexistent proof, if, as defendant contends, there was no proof; rather, we conclude that the jury did decide that there was sufficient evidentiary proof that the defendant and Dr. Becker

had engaged in a scheme to defraud. We cannot say that the jury was incorrect in its decision.

## Alleged Trial Errors

### The Doctors' Testimony

Reicin maintains that the trial judge committed prejudicial error (1) by refusing to strike Dr. Becker's "fabricated direct testimony about conversations with defendant," and (2) by refusing to allow Dr. Gerald Atlas, whom defendant wished to call as an expert witness, to testify.

As to each of the counts in which the client involved was hospitalized, Dr. Becker testified to conversations he had had with defendant Reicin wherein Reicin advised him to hospitalize the client. The defendant contends that cross-examination of Dr. Becker revealed that, in each instance, either the doctor had no present recollection of the particular conversation and his files contained no notes concerning such conversation or that, where Becker did have pertinent notes, he simply relied on what was stated in those notes without having any present recollection at all. In both kinds of situations, Dr. Becker assertedly fabricated or, at least, embellished a substantial part of the supposed conversations he had had with Reicin.

■ The notes on which Dr. Becker relied at trial had been admitted into evidence as business records and as past recollection recorded. Reicin claims that "[a]lthough the notes remained admissible . . ., the oral testimony should have been stricken . . . . [T]here was no evidentiary basis for [Dr. Becker's] testimony."

The defendant relies heavily on Dr. Becker's responses to questions on cross-examination about his recollection of particular conversations with Reicin. The exchanges between defense counsel and Dr. Becker are ambiguous. It is not clear that the witness understood counsel's questions about his "actual recollection" "as you sit there now." He rather clearly did not have recollection

of many of the incidents independently of his recorded memoranda, but, after looking at these memoranda, he did testify as to the incidents. Because of the combination of "past recollection" and "recollection refreshed," the trial judge would not have been justified in striking Dr. Becker's testimony. *See generally* C. McCormick, Evidence, ch. 30 (2d ed. 1972). It was appropriate for the jury to determine Dr. Becker's credibility and the weight to be given to his testimony, which pertained to a few of several thousand patients he had seen several years before. Although it seems unlikely that Dr. Becker would have had an independent recollection, doctors customarily depend upon notes made during patient contacts for the purpose of refreshing their recollections concerning the patient. From hearing and observing the witness, the jury could decide whether he was fabricating or whether he was testifying with recollection refreshed.

█ Dr. Becker's testimony on direct examination that in his medical opinion none of the patients had required hospitalization and that he would not have hospitalized them absent Reicin's requests undoubtedly helped the Government's case. The defendant wished to counteract this deleterious evidence through the expert testimony of Dr. Gerald Atlas, to whom the defendant had shown the hospital records of each hospitalized claimant. In an offer of proof, counsel indicated that Dr. Atlas would have stated, if he had been allowed to testify, that, based upon a reasonable degree of medical certainty, he would have hospitalized those persons if they had been his patients. This counter testimony, Reicin argues, would have (1) impeached Dr. Becker's credibility, (2) undermined the basis for an inference of fraud upon the companies involved, and (3) circumstantially shown Reicin's good faith.

The trial court had refused to permit Dr. Atlas to testify on the ground that the proposed testimony was irrelevant. We, too, conclude that this supposed "rebuttal" testimony went to collateral matters. The district court exercised its discretion properly.

This case is not a personal injury action. The primary question at trial was whether Reicin had knowingly participated in a scheme to misrepresent information to and defraud insurance and other companies through use of the mail. Consequently, the schemers' intent at the time they acted was crucial. Dr. Becker testified that but for Reicin's insistence he would not have hospitalized certain of the clients. The record does not show that Reicin, a lawyer, was competent to contradict Dr. Becker's judgment on medical grounds. Nor was there evidence that the defendant consulted other doctors on the question of hospitalization. Yet Reicin insisted on hospitalization. His intent to defraud does not turn on whether some of the clients "actually" needed such treatment; it is enough that the defendant thought at the time that they did not or that he made the decision to hospitalize for the purpose of making a better case without regard to whether there was need therefor. "One who acts with reckless indifference as to whether a representation is true or false is chargeable as if he had knowledge of its falsity." Irwin v. United States, 338 F.2d 770, 774 (9th Cir. 1964), cert. denied, 381 U.S. 911, 85 S.Ct. 1530, 14 L.Ed.2d 433 (1965).

█ Further, the success of a scheme to defraud, that is, whether the victim lost money because of it, is not a prerequisite to a conviction for mail fraud. United States v. George, 477 F.2d 508 (7th Cir. 1973, cert. denied, 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61; Blachly v. United States, 380 F.2d .665, 672–673 (5th Cir. 1967).

In sum, Dr. Atlas's proposed testimony would not serve to negate the existence of this part of the scheme. The existence of the scheme is the relevant proof requirement. *Cf.* United States v. Joyce, 499 F.2d 9, at 22 (7th Cir. 1974).

*The Prosecutor's Closing Argument*

■ The defendant next asserts that he was denied a fair trial because the prosecutor during closing argument supposedly (1) commented, albeit indirectly, on Reicin's failure to take the stand, (2) accused a witness of perjury and Reicin of suborning that perjury, and (3) inflamed the jury against the defendant.

We have examined the prosecutor's closing argument, paying particular attention to those passages to which the defendant has cited us. Final arguments in this case, occupying in excess of 150 pages of the transcript, can scarcely be labeled as laconic. The particular phrases which the defendant now attacks as being comments on the defendant's failure to take the witness stand were typified by: "Reicin says, through other witnesses, . . ." and "for some reason that only Reicin knows . . . ." While the first of these was used on several occasions and perhaps is an inartful locution for a prosecutor who should not only refrain from commenting on the failure of a defendant to take the witness stand but should guard against the appearance of doing so, nevertheless, in the context of the extensive argument in this case we do not read in these introductory remarks the illative meaning that the defendant finds.

The first phrase was used in reference to that to which the defendant's witnesses testified, and the second phrase taken in context referred to defendant's intent in effecting a change of modus operandi. We cannot say from the record that the "language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be comment on the defendant's failure to testify." United States v. Lyon, 397 F.2d 505, 509 (7th Cir. 1968), cert. denied, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117.

Further, not only did the trial court instruct the jury on the matter, but Reicin's counsel in his final argument said, "You will also be told that you must not and you may not discuss or consider the fact that the defendant did not testify in this case." The fact that he did not testify was no secret. Impropriety would only arise from the suggestion that the failure somehow should be construed against the defendant.

Finally, as in *Lyon*, there was no objection to the use of these statements. We are not unmindful of the disadvantages of interrupting opposing counsel's argument, but we are of the opinion that if the claimed transgression was so egregious as to constitute plain error it well should have and probably would have triggered an interruptive objection.

■ The prosecutor's remarks about perjury related to the testimony of defense witness Philip Wertz, an attorney employed by the defendant's firm from 1966 to 1968. Wertz's account of certain aspects of the Hernandez transaction differed from that of Government witness Thomas Fahey, an insurance adjuster. In summarizing Wertz's testimony, the prosecutor stated:

"Now I haven't the slightest idea, but I have got a good imagination and maybe I can conjure something up in my mind to that effect—but nonetheless, I don't really know what inducements Reicin could have used to prevail upon Wertz to engage in that incredible state of perjury."

The prosecutor continued:

"But today, for fear that maybe some future employer might not believe him, he has got to go back and do for you in front of you today, Mr. Reicin's bidding, and that bidding, unfortunately, includes and encompasses what I consider to be some pretty severe perjury.

"Let's take another example about Mr. Wertz, a man who I really feel sorry for because I am sure until he had to appear in this courtroom he was a relatively clean individual."

While it may be playing with words and while, despite the native intelligence of jurors, they might have difficulty in

distinguishing between a forthright statement in argument that a witness has committed perjury and an assertion such as the one made by Reicin's counsel, "Now I am not saying these people are guilty of deliberate perjury," nevertheless, the courts have viewed the direct accusation of the crime of perjury with considerable disfavor. *See, e. g.,* Weathers v. United States, 117 F.2d 585 (5th Cir. 1941).

Again, however, we do not look at the statement in a vacuum but in the context of the particular trial. We have already adverted to the extensive nature of the final argument. We do not mean to suggest that a three-week trial would have called for a shortened summation, but we do find some significance in the relationship of the size of the craft to the body of the water it occupies. Secondly, on the first reference to perjury there was no objection but the prosecutor continued reviewing the questioned testimony. Three pages later in the transcript we find the second use of the word "perjury." Again there was no objection, and it was not until the end of the last paragraph quoted above that there was an objection. Even then the primary thrust of the objection was that the prosecutor had misstated the testimony. The trial judge responded that the jury would have to decide what the facts were. Again, counsel referred to the misstatement and finally said, "He is also accusing Mr. Wertz of perjury just because he doesn't agree with Mr. Fahey." After further reference by the court to the jury determining the facts, defense counsel stated, "I do object to the prosecutor misstating the testimony." There was neither a motion to admonish nor a motion for a mistrial. Further, there was no objection to the intimation that defendant had suborned perjury. In its instructions, the court did advise the jury that "arguments of counsel are not evidence."

From the record it is clear that Reicin's counsel competently, effectively, and vigorously represented him. Yet he now seeks to have us reverse the judg-

ment of conviction on a basis that he barely recognized during the course of the trial.

We have little difficulty in discerning the probable cause of the minimal nature of the objection. The closing arguments had few anacreontic attributes. In less formal terms, the arguments of both counsel were free-swinging and hard-hitting. In the final argument of defense counsel, we note the following references to the verity of Government witnesses:

"We agree that Dr. Becker was engaged in a scheme, a fraud. We agree that Dr. Becker is a liar, a cheat, a charlatan . . . . Because Dr. Becker hasn't got the slightest—not the slightest concern for the truth . . . . Dr. Becker himself, the great witness, the government's puppet . . . . Now Dr. Becker, he is paying his debt to the government . . . . Now I am not saying these people [witnesses other than Dr. Becker] are guilty of deliberate perjury . . . . That man came into this court and took that stand with one purpose in mind, to hurt Ed Reicin . . . . I will tell you I don't believe Becker. Becker deliberately pretended actual recollection of an event that never happened, never happened, to hurt Ed Reicin, for the government . . . . Another deliberate lie—this is a little thing, but it goes to show you the nature of the man you are dealing with . . . . Now Fahey says he didn't tell about that. And I find that hard to believe . . . ."

In addition, while not directly accusing the Government of suborning perjury, defense counsel made several references to the method in which the investigating agents called in Reicin's clients and to false statements clients had signed by the time they had left the governmental offices.

We decline under the circumstances here involved to find that the two references to perjury are sufficient to mandate a reversal.

Finally, the defendant complains that by the following comments during rebuttal the prosecutor overstepped the permissible bounds of advocacy:

"Once we are talking about the fraud and who pays for it, don't go back into the jury room and feel that the victims are the insurance companies, because I assure you, whatever the insurance companies pay out, they get right back again through premiums from you, from me and from anybody else who has to pay for automobile insurance and for the risks that you take under that particular premium. And one of the risks that I don't want to have to take and that any driver who has to pay automobile premiums wouldn't want to take, are the risks of fraud that people like Mr. Reicin perpetrate against the insurance companies that you and I have to pay for. That is one point.

. . .

"The type of law that Mr. Reicin was practicing during 1965, during 1966, '67 and '68, you have got a chance to stop today. Because if anybody else is doing it, if you tell they can't do it as loudly and as thoroughly as you can eleven times over, ladies and gentlemen, somehow it is going to stop."

After this last comment, counsel objected "to this line of argument." The court sustained the objection and declared that it would "instruct [the jury] to follow the law . . . and decide the case solely upon the evidence that they have heard here in open court." As we have mentioned hereinbefore, the court did so instruct the jury.

■ The courts generally and properly disapprove of appeals to jurors' pecuniary interests. United States v. Trutenko, 490 F.2d 678 (7th Cir. 1973). However, such remarks, although improper, do not necessarily constitute reversible error. They must be considered in the context of the entire trial. *Cf.* Epperson v. United States, 490 F.2d 98 (7th Cir. 1973); United States v. Me-

dansky, 486 F.2d 807, 815 (7th Cir. 1973), cert. denied, 415 U.S. 989, 94 S. Ct. 1587, 39 L.Ed.2d 886 (1974). Similarly, prosecutorial comment about the salutary effect on society of a particular conviction must be evaluated in light of the entire closing argument and of the trial as a whole. What we have said heretofore about the nature of the argument, of course, is applicable here.

Also, the court sustained the defendant's objection and included a cautionary instruction in its charge. More significantly, "inflamed passions" and the abandonment of reasoned scrutiny rather obviously do not explain the jury's verdict. Indeed, Reicin in another portion of his brief implicitly concedes this: ". . . the meager evidence introduced by the government, . . . evidenced by the fact that the jury acquitted on 10 of 11 counts . . . .

We hold therefore that the prosecutor's argument does not require reversal.

*The Refusal to Quash the Indictment*

Prior to trial, Reicin moved to quash the indictment on the grounds that (1) the Government had "systematically abused the grand jury process," and (2) the indictment was based almost entirely on hearsay evidence. The court denied this motion and subsequent motions based on these grounds. Reicin claims that the district court abused its discretion in so ruling and that it, at least, should have granted him a hearing on the motions.

■ Although arguably the procedure utilized might harbor a potential for abuse, we find no inherent prejudice to a defendant where Government agents interview witnesses who have been subpoenaed by the grand jury. And, after examining the pertinent portions of the record in the present case, we conclude that the district judge acted properly and within the scope of his discretion in refusing to quash the indictment or to arrest judgment, drastic remedies. Further, the materials submitted with the various motions were not sufficient to *require* the judge to hold a hearing.

We do not understand that merely because persons have been subpoenaed by the grand jury the Government should be barred from continuing with its investigation and from conducting interviews with those prospective witnesses. In the present case, all but two of the witnesses so interviewed did testify at the trial. Their credibility was subject to examination by the trial jury. Any claimed governmental coercion was also subject to being brought out before the trial jury.

As to the related hearsay contention, United States v. Holmes, 452 F.2d 249, 274 (7th Cir. 1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479 (1972), and United States v. Daddano, 432 F.2d 1119, 1125 (7th Cir. 1970), cert. denied, 402 U.S. 905, 91 S.Ct. 1366, 28 L.Ed.2d 645 (1971), establish the governing rule in the Seventh Circuit. We decline Reicin's suggestion that we overrule these precedents.

Other points raised by the defendant upon this appeal are ancillary to those discussed herein. Finding no basis for reversal, we affirm the judgment of conviction.

Affirmed.

## APPENDIX TO THE COURT'S OPINION

The JUNE 1970 GRAND JURY charges:

1. That beginning in or about January 1965, and continuing to on or about date of the filing of this indictment, at Chicago, in the Northern District of Illinois, Eastern Division, and in divers other places to the Grand Jury unknown,

### EDWARD E. REICIN

defendant herein, and WILLIAM BECKER, not a defendant herein, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises from insurance firms, companies, associations and corporations, including but not limited to: Aetna Insurance Company, Allstate Insurance Company, Chicago Transit Authority, The Hanover Insurance Group, Horace Mann Insurance Group, Inter-Insurance Exchange of the Chicago Motor Club, National Emblem Insurance Company, Northwestern Security Insurance Company, Royal Globe Insurance Company and Unigard Insurance Company and various persons who were clients of said defendant EDWARD E. REICIN, an attorney well knowing at the time that the pretenses, representations, and promises would be and were false when made; and which said scheme and artifice to defraud so devised and intended to be devised by the said defendant was in substance as follows:

2. It was part of the said scheme and artifice to defraud that WILLIAM BECKER, a duly licensed physician authorized to practice medicine in the State of Illinois, would and did examine persons involved in automobile accidents within the State of Illinois.

3. It was a further part of the said scheme and artifice to defraud that the defendant, EDWARD E. REICIN, duly licensed attorney authorized to practice law in the State of Illinois would and did represent persons involved in automobile accidents within the State of Illinois.

4. It was a further part of the said scheme and artifice to defraud that the defendant would and did prepare and cause to be prepared medical bills and accident reports, which bills and reports contained false and fraudulent pretenses and representations.

5. It was a further part of the said scheme and artifice to defraud that the defendant, EDWARD E. REICIN, would and did cause his clients to be sent to WILLIAM BECKER, after the clients had been involved in accidents.

6. It was a further part of the said scheme and artifice to defraud that WILLIAM BECKER would and did cause to be furnished to defendant EDWARD E. REICIN, medical bills and reports for the said clients of the defend-

ant, EDWARD E. REICIN, and said medical bills and reports contained false and fraudulent pretenses and representations, in that said bills were rendered in amounts far in excess of the amounts actually due and owing, said reports were rendered reflecting nonexistent injuries and damages.

7. It was a further part of the said scheme and artifice to defraud that the defendant EDWARD E. REICIN would and did send and cause to be sent to the said insurance firms, companies, associations and corporations the said medical bills of WILLIAM BECKER and accident reports, knowing that the said medical bills and accident reports contained false and fraudulent pretenses and representations.

8. It was a further part of the said scheme and artifice to defraud that the defendant EDWARD E. REICIN would and did deduct the full amounts of the excessive and fraudulently inflated medical bills from the settlements to his various clients.

9. It was a further part of the said scheme and artifice to defraud that the defendant EDWARD E. REICIN would and did divide between himself and WILLIAM BECKER the amounts of the excessive and fraudulently inflated medical bills deducted from the settlements due his various clients.

10. It was a further part of the said scheme and artifice to defraud that the defendant EDWARD E. REICIN and WILLIAM BECKER would and did cause clients of EDWARD E. REICIN to absent themselves from employment to increase their alleged damages.

11. It was a further part of the said scheme and artifice to defraud that the defendant EDWARD E. REICIN would and did engage various individuals, whose names are unknown to the Grand Jury, to refer accident victims to him.

12. It was a further part of the said scheme and artifice to defraud that the defendant, EDWARD E. REICIN would and did cause clients to obtain automobile repair estimates which estimates were excessively and fraudulently inflated.

13. It was a further part of the said scheme and artifice to defraud that the defendant EDWARD E. REICIN would and did send and cause to be sent to the said insurance firms, companies, associations and corporations the said excessively and fraudulently inflated automobile repair estimates knowing that the said automobile repair estimates contained false and fraudulent pretenses and representations.

14.  .  .  .

## COUNT IX

1. The June 1970 GRAND JURY realleges all of the allegations of the First Count of this indictment except those contained in paragraph 14 thereof.

2. The June 1970 GRAND JURY further charges that on or about September 25, 1967, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant EDWARD E. REICIN, for the purpose of executing the aforesaid scheme and artifice to defraud and attempting to do so, did knowingly cause to be delivered by the Post Office Department of the United States, according to the directions thereon, a letter addressed to:

> Royal Globe Insurance
> 175 West Jackson Boulevard
> Chicago, Illinois
> Attention: Mr. Raymond J. Muselon

in violation of Title 18, United States Code, Section 1341.