**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Carmen BASTONE and Arthur Veal,**
**Defendants-Appellants.**

**No. 75–1417.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1975.

Decided Dec. 8, 1975.

Rehearing and Rehearing En Banc
Denied Feb. 12, 1976.

974

Jerome Rotenberg, Julius Lucius Echeles, Chicago, Ill., for defendants-appellants.

Samuel K. Skinner, U. S. Atty., Thomas K. McQueen and Stephen J. Senderowitz, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, and PELL and BAUER, Circuit Judges.

BAUER, Circuit Judge.

Defendants-appellants Carmen Bastone and Arthur Veal were charged under 18 U.S.C. § 371, along with eighteen other defendants,[1] with conspiracy to transport and cause to be transported in interstate commerce stolen semi-trailers of a total value in excess of $5,000, in violation of 18 U.S.C. § 2314.[2] Verdicts of guilty were returned as to Bastone, Veal and four others. Bastone was sentenced to five years imprisonment and Veal received two years imprisonment.

---

1. Prior to trial one defendant, Daniel Lonero, was severed due to illness. Eleven defendants, John Falcione Patrick Boenzi, William Paradise, Constantine Athas, Raymond Murray, Charles P. Garner, Robert Walley, Ronald Schoenneman, Eugene Marino, Robert Quagliato and Frank DeRosa, pled guilty. One defendant, Salvatore Bastone, was found not guilty. Five other individuals were named as co-conspirators but were not indicted: Harry Mizok, John Crediedo, Daniel O'Neill, Clarence White and Donald Svehla.

2. 18 U.S.C. § 2314 states, inter alia:

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . . [s]hall be fined not more than $10,-000 or imprisoned not more than ten years, or both."

Evidence of the defendants' conduct and the conspiracy was presented primarily through Ronald Schoenneman, an accomplice witness who received certain benefits from the government in exchange for his testimony. The evidence presented showed that Schoenneman met with Carmen Bastone at a coffee shop in a Chicago suburb during the summer of 1970 to discuss the business of stealing trailers. A scheme[3] was outlined to Bastone by Schoenneman whereby forty-foot semi-trailer vans would be stolen from railroad yards and truck docks and then taken to so-called "cleaners", who would remove from the trailers all identifying items such as signs, lettering and public identification, in addition to obliterating serial numbers variously hidden about the trailer. In some cases, the trailers would then be further cleaned by an acid wash and, if need be, repainted. Titles would be obtained and, by fraudulent applications for new titles, bogus serial numbers would be imposed on the faces of previously legitimate titles. Those numbers, in turn, would be applied to the trailers to conform with the altered titles. Customers would be obtained, both in Illinois and in other states, the trailers sold, and the profits split among the various participants. Initially Schoenneman agreed to pay $900 for each stolen trailer Bastone provided. Eventually Bastone and Schoenneman became partners and agreed to divide their expenses equally.

Schoenneman also met with co-defendant and appellant Arthur Veal at his Chicago trailer repair ship—Artco—and obtained Veal's services as a "cleaner" of the stolen trailers supplied by Bastone. Veal agreed to perform his services and then drop the trailers, which were to be marked with a painted "x", in a vacant lot.

Schoenneman next contacted Raymond Murray whose task it was to find customers for the disguised trailers. When Murray placed his first order with Schoenneman both of the defendants were notified that the "business" was underway. Deliveries from Veal's shop began in November of 1970. Several of the trailers were sold to customers in Indiana and Kentucky. Veal received two as compensation for his services and those remaining were sold to Mary Ann Bakeries. Sales of trailers to Mary Ann Bakeries continued through 1971 and early 1972. Veal painted the trailers to match other Mary Ann equipment and Schoenneman provided bogus serial numbers. In 1971 Veal also stole trailers from General Transport Equipment Co. and cleaned them for resale. He further arranged to purchase junk trailers from United Parcel Service in order to obtain title certificates to be used on the stolen trailers. Old trailers and junk titles were also purchased by Schoenneman and Bastone from Fruehauf Trailer. The titles were altered and used in the sale of the stolen and cleaned trailers.

In May, 1972 Schoenneman began cooperating with the Federal Bureau of Investigation. From May 19 through June 20 he made a series of telephone calls to Bastone and other conspirators during which he discussed the stolen trailer business. Many of those conversations were recorded.

I. EVIDENCE OF TAPE RECORDED TELEPHONE CONVERSATIONS BETWEEN CHIEF PROSECUTION WITNESS SCHOENNEMAN AND DEFENDANT BASTONE WERE PROPERLY ADMITTED.

Defendant Bastone moved to suppress the use of five telephone conversations

---

**3.** The indictment alleged an ongoing conspiracy to steal and re-sell semi-trailers for a period of three and one-half years. Our own reading of the record indicates an elaborate scheme involving many parties. However, since this appeal involves only two of the defendants we have recounted only those facts in this opinion which we believe are applicable to the appeal of Bastone and Veal. Neither appellant presents a serious challenge to the sufficiency of the evidence presented at trial.

he had with Schoenneman which were tape recorded. Bastone argued that the recordings were improper and inadmissible because Schoenneman did not give his voluntary consent; and, further, that he was the suspect of an investigation in which Schoenneman was acting as a government agent. Thus it is his contention he was entitled to be given the *Miranda* warnings before partaking in the telephone conversations. After hearing the evidence, including testimony of Schoenneman, the trial court denied the motion to suppress. We believe the trial court was correct in denying the motion.

■ It is well established that a party to a telephone conversation risks a third party hearing the content of the conversation with the consent of the second party. In the federal system if one party consents to the electronic recording of a conversation it is generally admissible despite the other party's objection. See *Rathbun v. United States,* 355 U.S. 107, 111, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *Carnes v. United States,* 295 F.2d 598, 602 (5th Cir. 1961); *United States v. Martin,* 372 F.2d 63, 65 (7th Cir.), *cert. denied,* 387 U.S. 919, 87 S.Ct. 2033, 18 L.Ed.2d 972 (1967).

The essential question here is whether or not Schoenneman gave his consent to recording the conversations. The appellant argues that the trial court ignored the realities of the situation which indicated that Schoenneman only purported to consent to the interception and recording. He cites the decisions of *Weiss v. United States,* 308 U.S. 321, 330, 60 S.Ct. 269, 84 L.Ed. 298 (1939); *United States v. Laughlin,* 223 F.Supp. 623 (D.C. 1963); and *United States v. Napier,* 451 F.2d 552 (5th Cir. 1971); however, those cases involve situations where the party's consent could be seriously questioned either because of incapacity or government pressure. On the other hand, the facts in this case belie the contention that Schoenneman's consent was involuntary.

Schoenneman had not received "promises" of leniency or of a change in location and new identity prior to his mak-

ing the telephone calls. After several weeks of conversations elapsed, Schoenneman suggested the taping of telephone conversations. While there was discussion about the United States Marshal's protective custody program at various meetings, the actual decision to move Schoenneman and his family out of town came about one week prior to his June 22nd departure, well beyond the first telephone recording of May 19.

During this cooperation with the government, Schoenneman was receiving no compensation, lived at his home, was never arrested, restricted, nor was he under surveillance. Schoenneman was aware that he would not receive immunity but that his cooperation would be made known at trial. Finally, the trial court also was made aware of executed advice of rights and consent to monitor forms, personally executed by Schoenneman before each conversation.

■ We fully realize that Schoenneman's cooperation stemmed from the fact that he believed he would receive a better deal from the government. Yet that fact alone does not vitiate his consent or indicate that his actions were the product of government control. A finding of involuntariness or coercion should not result simply because a person has been indicted or is the subject of a government investigation. *United States v. Silva,* 449 F.2d 145, 146 (1st Cir. 1971); *United States v. Jones,* 140 U.S.App.D.C. 70, 433 F.2d 1176, 1180 (1970), *cert. denied,* 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971); also see *United States v. Bonanno,* 487 F.2d 654 (2d Cir. 1973).

■ That Bastone was not given *Miranda* warnings is quite frankly a weak argument. A person is not entitled to warnings simply because an investigation has focused upon him. The test is not focus alone, but rather, focus plus custodial interrogation. *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The cases cited by Bastone

in support of his focus contention are different in that they deal with tax cases in which a taxpayer is interviewed after his case has been presented to the Intelligence Division of the Internal Revenue Service. In those cases, the putative defendant clearly faces government compulsion. See *United States v. Lockyer*, 448 F.2d 417 (10th Cir. 1971); *United States v. Turzynski*, 268 F.Supp. 847 (N.D.Ill.1967); *United States v. Wainwright*, 284 F.Supp. 129 (D.Colo.1968).

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" (*Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612). When Bastone made the admissions during the telephone conversation he was neither in custody nor deprived of his freedom, nor was he being interrogated by law enforcement officers.

■ Simply because Schoenneman was operating as a government informant does not make the content of the telephone conversations inadmissible. The Fourth Amendment has never been construed to protect a person who voluntarily confides in another person who is acting as a government informant or undercover agent. *United States v. White,* 401 U.S. 745, 749, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1970); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). In *United States v. Gardner,* 516 F.2d 334 (7th Cir. 1975), a "cooperating individual" apprised the FBI of Gardner's attempt to dispose of certain stolen securities. There, a plan was developed by the FBI by which agents assumed undercover roles as a bank executive and an attorney willing to prepare a fraudulent certificate of ownership. When the latter agent met with Gardner, he responded to a question about the origin of the theft and committed incriminating actions. Citing *Miranda* and *Hoffa,* the court held that Gardner's admission and actions were not the consequence of inherent compulsion because the agents had assumed undercover identities. Therefore, Gardner was "not confronted with governmental authority of which he was aware . .," and was not entitled to receive *Miranda* warnings (516 F.2d at 339).

■ Similarly, in the case at bar, the activities of the FBI agents when Bastone made these recorded admissions were a part of the undisclosed investigative process in which Schoenneman was a voluntary participant, and, consequently, Bastone was not confronted with governmental authority. Therefore Bastone had no right to receive *Miranda* warnings at the times in question.[4]

■ Bastone next asserts that even if the telephone conversations were admissible they operated to deny him a fair trial because the court refused to excise certain prejudicial portions and because Schoenneman was allowed to testify as to what he himself meant by certain slang words which he had used in the taped conversations. We think that the decision not to edit the tapes and to allow explanation of the slang terms was clearly within the purview of the trial court's discretion. In such an instance we believe that a reversal should not occur unless there is manifest error or an abuse of this discretion. In this case the trial judge was best able to assess the impact that the tapes and testimony would have upon the jurors. Thus, now on appeal, we rely heavily upon his judgment and find no error or abuse of his discretion.

---

4. Bastone points out that the government cannot always absolve itself of official responsibility for the acts of private citizens, citing *United States v. Stein,* 322 F.Supp. 346 (N.D.Ill. 1971). In *Stein* the government encouraged a private individual's "irregular acquisition" of certain evidence rendering the exclusionary rule applicable. However in this case there is no evidence of government encouragement that is not in accordance with the law.

## II. THERE WAS NO PREJUDICIAL VARIANCE IN THE INDICTMENT CHARGING A SINGLE CONSPIRACY AND THE PROOF PRESENTED AT TRIAL.

The crucial question here is: did the government's case show one common scheme, plan or purpose indicating a conspiracy among the defendants? Or did the evidence show a number of separate unrelated conspiracies? Both defendants contend that multiple conspiracies were shown and the jury may have considered against the defendants evidence pertaining to separate conspiracies to which each of them was clearly not a party, including evidence of acts and declarations of alleged co-conspirators with whom they were not in any way connected. Further, that their individual cases were substantially prejudiced because the trial judge failed to give an instruction telling the jurors that a finding of one single conspiracy was a prerequisite to convicting the defendants. Veal also claims that it was error for the court not to give a limiting instruction regarding certain evidence.

The benchmark and controlling decision on the question of a single conspiracy being charged and multiple conspiracies being proven is *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In *Kotteakos,* thirty-two persons were indicted for a single conspiracy to induce various financial institutions to make loans which would then be insured by the Federal Housing Administration on the basis of fraudulent information. Nineteen of these persons were brought to trial and seven were eventually convicted. The government admitted that the evidence proved eight or more separate conspiracies by separate groups of conspirators which had little or no connection with each other.

However, by simply charging one conspiracy the government was able to present a mass of evidence which reflected equally on the most culpable to the most innocent of the defendants.

Consequently, the Supreme Court reversed stating:

". . . if the practice here followed were to stand, we see nothing to prevent its extension to a dozen, a score, or more conspiracies and at the same time to scores of men involved, if at all, only separately in them. The dangers of transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one can really say prejudice to substantial right has not taken place . . . as it [the offense] is broadened to include more and more, in varying degrees of attachment to the confederation, the possibilities for miscarriage of justice to particular individuals becomes greater and greater."

Of course, the Court has also held that not every variance is fatal. *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Also see *United States v. Kenny,* 462 F.2d 1205 (3d Cir. 1972). Recently this Court set forth the test to distinguish between a single conspiracy and multiple conspiracies in *United States v. Varelli,* 407 F.2d 735 (7th Cir. 1969), as follows:

"While the parties to the agreement must know of each other's existence, they need not know each other's identity nor need there be direct contact. The agreement may continue for a long period of time and include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate conspiracies.

The distinction must be made between separate conspiracies, where certain parties are common to all and one overall continuing conspiracy with various parties joining and terminating their relationship at different times. Various people knowingly join-

ing together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy.

In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy" (407 F.2d at 742) (citations omitted).

The *Varelli* test is applicable to the case at bar for the proof here plainly demonstrated one overall agreement among the various parties to perform different functions in order to carry out the single objective of the conspiracy— the sale of stolen trailers.[5]

The evidence also showed a few collateral transactions that were not totally directed toward the main scheme or conspiracy. However, since the trial judge adequately instructed the jury,[6] the admission of such testimony that did not support a continuous single conspir-

acy was harmless. In addition the collateral activities, denoted as separate conspiracies by the appellants, did not really deal with Veal or Bastone.[7]

We believe that under *United States v. Johnson,* 515 F.2d 730 (7th Cir. 1975) the trial court could have left up to the jury the decision of whether the government presented evidence of one conspiracy or multiple conspiracies. But, it is quite clear that the trial judge did not have to give the instruction submitted by the defense which stated "If you [jurors] find that there were a number of separate and distinct conspiracies or enterprises in which some but not all of the defendants or others were involved, you must find the defendants not guilty." Clearly this instruction could be proper in some conspiracy cases. However, it is not appropriate where the defense attempts to create a variance through cross-examination by bringing in new conspiracies. Here the court's own instruction was more neutral and advised simply that the jury must find that the defendants knowingly and willfully participated in the single, particular conspiracy charged. Finally on this point Bastone correctly cites the case of *Tinsley v. United States,* 43 F.2d 890 (8th Cir. 1930) for the proposition that a

---

5. In order to meet a common objective, indispensible functions were performed by one or more conspirators. Initially, the trailers were stolen. Bastone clearly had a part in completing this function by virtue of his obtaining thieves. Next, to avoid detection, the stolen trailer was "cleaned", any and all identifying objects removed. This was the work of Art Veal and others. Next, there had to be acquisition of titles which were forged to evidence a phony serial number. Thereafter, the phony serial number was placed upon the trailer by the "cleaners". After the trailer was prepared, customers were obtained. After the sale was consummated, the trailers were delivered with titles and the payment therefor returned to the administrator, Schoenneman, for distribution to each of the above-named participants. Finally, when capital was low, loans were given to keep the various participants content. This, too, was a major role played by Bastone.

6. The trial judge stated in part as follows:
 "In determining whether a conspiracy existed, the jury should consider the actions

and declarations of all the alleged participants. However, in determining whether a particular defendant was a member of the conspiracy, if any, the jury should consider only his acts and statements. He cannot be bound by the acts and declarations of other participants until it is established that a conspiracy existed and that he was one of the members.

7. The so-called additional conspiracies included the following: Schoenneman's hiatus and cessation of illegal activities; the stolen trailer operation which involved only Svehla and Murray; the separate operation involving Schoenneman and Murray which used the O'Rourke Cartage yard at Calumet Harbor. Also much of this evidence was brought out on cross-examination of Schoenneman. We do not believe it would be fair to allow the defense to manufacture a variance through use of the cross-examination of the government's chief witness.

conspiracy cannot occur where the defendants were not working together towards a common goal. Our reading of *Tinsley* discloses that factually the decision represents "a horse of a different color", the mutual understanding shown here was wholly lacking in the facts presented there.

 Bastone argues that a defendant should not stand convicted in a case where the evidence does not permit the conclusion that he was aware of the scope of the overall enterprise and knowingly participated therein, citing *United States v. Peoni,* 100 F.2d 401 (2d Cir. 1938); *United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); *Dennis v. United States,* 302 F.2d 5 (10th Cir. 1962). The fact that the defendants may not have known all the particulars of the total scope of a conspiracy does not bar a conviction. *Blumenthal v. United States, supra,* 332 U.S. at 557, 68 S.Ct. 248 (1947); *United States v. Crosby,* 294 F.2d 928, 945 (2d Cir. 1961). As Judge Learned Hand cogently stated in *United States v. Andolschek,* 142 F.2d 503 (2d Cir. 1944) at p. 507:

> "It is true that a party to a conspiracy need not know the identity, or even the number, of his confederates; when he embarks upon a criminal venture of indefinite outline, he takes his chances as to its content and membership, so be it if they fall within the common purposes as he understands them."

### III. THE TRIAL COURT DID NOT ERRONEOUSLY LIMIT THE DEFENDANTS' RIGHT OF CROSS–EXAMINATION.

Under the Sixth Amendment every defendant is given the right to confront those witnesses presented against him. Bastone states that the trial court inhibited his constitutional right by prohibiting proper defense attempts to expose to the jury various facts concerning prose-cution witnesses Garner, Murray, Ponzevic, and especially, Schoenneman. We think the key phrase in this argument is "proper attempts". A review of the record indicates that the defense attorneys, in their zealous attempts to bring out the nefarious activities of the government's witnesses, chose to ignore *the rules of evidence.* We will consider the defense arguments on an individual witness basis.

 First, defendants claim that the trial court erred in preventing questioning aimed at disclosing Schoenneman's state of mind (i. e., did he believe the government wanted someone higher up; did he think he would get a better "deal" for himself if he implicated defendant; was he not giving the government what he thought it wanted for his own benefit; and the like). The government's response is simply that the defense failed to ask the right questions. It is clearly within the trial court's discretion to permit testimony as to promises made by the government in exchange for favorable testimony. *DeMarco v. United States,* 415 U.S. 449, 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974); *United States v. Rodriguez,* 439 F.2d 782, 783 (9th Cir. 1971); *United States v. Greenberg,* 423 F.2d 1106, 1108 (5th Cir. 1970); *Grant v. United States,* 368 F.2d 658, 661 (5th Cir. 1966); *United States v. Masino,* 275 F.2d 129, 131–132 (2d Cir. 1960). Whether or not to permit further testimony as to the witness' state of mind or motivation has been approved by the Supreme Court in certain cases. Cf. *Davis v. Alaska,* 415 U.S. 308, 315–318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). However, in this case the trial court, in its discretion, may have properly assumed that further cross-examination into the witness' subjective thoughts would not be meaningful in light of the examination conducted previously which clearly showed that the witness gained a great deal by becoming a witness for the government.[8] The trial court has broad

---

8. Schoenneman's devastating cross-examination showed that he had previously been investigated by the FBI regarding stolen trailers; that he had been in the phony title and stolen trailer business in the late 1960's; that he had debts of more than $300,000; that he obtained

discretion in determining probative value. *United States v. Kissane,* 478 F.2d 1098, 1101 (7th Cir. 1973); *United States v. Braasch,* 505 F.2d 139, 149 (7th Cir. 1974).

Second, defendants complain of the court's limitation of cross-examination of witness Ponzevic in that it prevented the defense from demonstrating that this witness had tailored his testimony to make it conform to an erroneous document. As a general rule a witness can be questioned about inconsistent testimony and the court may allow the use of extrinsic evidence to impeach the witness. *United States v. Barash,* 365 F.2d 395, 401 (2d Cir. 1966); *United States v. Borelli,* 336 F.2d 376 (2d Cir. 1964); *United States v. Partin,* 493 F.2d 750 (5th Cir. 1974). In addition a reviewing court will closely scrutinize contradictory testimony by an accomplice witness who would have reason to commit perjury. *United States v. Persico,* 305 F.2d 534, 537–540 (2d Cir. 1962); *United States v. Harris,* 462 F.2d 1033, 1035 (10th Cir. 1972). At trial witness Ponzevic was questioned as to whether he was trying to make his testimony conform to certain documents. The witness responded "It could be." Defense counsel pursued the issue. An objection was eventually made and the judge responded that an inquiry into the circumstances was proper but the manner in which counsel was doing it was objectionable. After some further questioning and objections, counsel stated "I have no further questions, Judge. I just cannot seem to get the right one out." Thus this reviewing court is presented with a situation where the court stated it would allow impeachment of the witness but trial counsel abandoned the issue. As a consequence the argument that the court erroneously limited the cross-examination and refused extrinsic evidence is meritless.

Third, the defendants contend that it was error for the court to rule that it could bring out the fact of witness Garner's prior felony convictions but not the fact that one of the convictions was for rape or to otherwise describe the nature of the prior conviction. The court did allow use of a theft conviction to show the witness' propensity to be dishonest. While not in effect, the new Federal Rules of Evidence would have barred the use of the rape conviction because it occurred twenty-two years ago.[9]

In the words of now Chief Justice Burger in his opinion in *Gordon v. United States,* 127 U.S.App.D.C. 343, 383 F.2d 936 (1967), the issue for the trial judge was whether he "believes the prejudicial effect of impeachment *far* outweighs the probative relevance of the prior conviction to the issue of credibili-

---

a bank loan to pay off certain debts by using stolen, fictitious titles to support his application; that the loans which he had obtained were, in some cases, the subjects of civil suits, and, in any event, were not paid since his cooperation with the government; further, that he was afraid he might get ten years incarceration for bank fraud; that he had filed no tax returns and paid no income tax for any fiscal year from 1968 to the present, despite making money in the stolen trailer business; that he had received no tax bills from the government and was never charged with failing to file, though an IRS criminal investigation was pending; that he was in the juice loan business, engaged in a stolen stocks and securities deal and fenced stolen merchandise.

**9.** Rule 609(b) provides:

"(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

ty" (383 F.2d at 939). That test was adopted by this Court in *United States v. DiVarco*, 484 F.2d 670, 677 (7th Cir. 1973), and, when applied to this record shows that the trial judge did not abuse his discretion in making his ruling.[10]

## IV. THE COURT DID NOT ERR IN DENYING THE MOTION FOR SEVERANCE.

In order to obtain a severance the moving party must show prejudice, i. e., "that he will be unable to obtain a fair trial without severance, not merely that a separate trial will offer a better chance of acquittal." *United States v. Blue*, 440 F.2d 300 at 302 (7th Cir. 1971); *Tillman v. United States*, 406 F.2d 930 (5th Cir. 1969); *United States v. Kahn*, 381 F.2d 824, 838 (7th Cir. 1967); *Oden v. United States*, 410 F.2d 103 (5th Cir. 1969).

On this point defendant Veal cites *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) contending he was prejudiced when his codefendant McMahon took the witness stand, testified that he had never seen Veal before coming to court, and, then, was cross-examined by the government. Included in the questions asked by the government was the query: "Did you [McMahon] tell the FBI on January 12, 1973, that you picked up trailers from Artco, a trailer repair shop?" McMahon

answered in the negative. Judge McMillen ruled that the government would not be allowed to call the FBI agent who interviewed McMahon to testify in rebuttal to the statement. *Bruton* is inapplicable because no confession was admitted in the government's case in chief and no rebuttal evidence was tendered on this point. McMahon's testimony was actually favorable to Veal, and he was available for cross-examination by Veal's counsel. *Nelson v. O'Neil*, 402 U.S. 622, 629–30, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971); *United States v. Clark*, 480 F.2d 1249, 1253 (5th Cir.), *cert. denied,* 414 U.S. 978, 94 S.Ct. 301, 38 L.Ed.2d 222 (1973); *United States v. Marine*, 413 F.2d 214, 217 (7th Cir. 1969), *cert. denied,* 396 U.S. 1001, 90 S.Ct. 550, 24 L.Ed.2d 493 (1970); *Government of Virgin Islands v. Ruiz*, 495 F.2d 1175 (3d Cir. 1974). As Professor Moore states:

". . . when the witness repudiates his pretrial inculpatory statement, however, or denies making it, there is no real opportunity for the defense to cross-examine with respect to that statement, and *Bruton* is arguably violated. Normally, the prosecution in this situation will use the earlier statement for purposes of impeachment, and the defense will be satisfied to rely on the witness' trial testimony and forego cross-examination. Nonetheless, there is no *Bruton* violation

---

**10.** The trial judge also cautioned the jurors about the credibility of testimony of witnesses who had prior convictions or expectations of favors from the government for giving testimony. The instruction stated:

"It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has been impeached.

The testimony of a witness may be discredited or impeached by showing that the witness has been convicted of a felony, that is, of a crime punishable by imprisonment for a term of years. Prior conviction does not render a witness incompetent to testify, but is merely a circumstance which you may consider in determining the credibility of the witness.

It is the province of the jury to determine the weight to be given to any prior conviction as impeachment.

An accomplice is one who voluntarily participates in the commission or the planning of a crime.

Certain witnesses called by the Government in this case have testified that they did criminal acts. The testimony of those witnesses must be considered with caution because those witnesses are accomplices.

The testimony of a witness who provides evidence against a defendant for a promise of favor from the Government, or for other personal advantage or vindication, must be examined and weighed by the jury with caution.

The jury must determine whether the witness' testimony has been affected by interest, or by prejudice against a defendant."

where the codefendant takes the witness stand and thereby makes himself accessible to cross-examination." Moore's *Federal Practice, Rules of Criminal Procedure,* Vol. 8, § 14.-04[2][c].

## V. THE EVIDENCE SHOWED THAT THE VALUE OF THE STOLEN GOODS EXCEEDED $5,000.

 Defendants were indicted under 18 U.S.C. § 2314. An essential jurisdictional prerequisite under § 2314 is that the stolen goods that are being transported exceed $5,000 in value. *United States v. Nall,* 437 F.2d 1177, 1184 (5th Cir. 1971); *United States v. Barker,* 313 F.Supp. 987 (D.Del.1970). Value as used in § 2314 is defined in 18 U.S.C. § 2311 as the aggregate value of all goods referred to in a single indictment. In this case the defendants point out that no distinction was drawn between stolen trailers in Illinois which never left the state, and stolen trailer deals which involved the interstate transportation of trailers stolen and cleaned in Illinois and sold out of state. Defendants contend it was prejudicial error to permit a cumulation of interstate and intrastate sales in order to meet the jurisdictional prerequisite.

We must reject the defendant's argument. The evidence, independent of local sales, showed that proof of value in excess of $5,000 was abundant. Twenty-three trailers were sold to purchasers in New Jersey and thirty-five trailers were sold to buyers in Indiana, Kentucky, and Georgia. Typical insurance claims paid on three stolen trailers which were sold interstate amounted to $4,000, $4,500, and $4,700.

Although certain stolen trailers were delivered locally at O'Hare Airport to Shulman Air Freight, Inc.,[11] the real owner and purchaser of the trailers was Ardmore Leasing Corp. of Cherry Hill, New Jersey. The titles to the trailers were transferred to Ardmore and checks received in payment for the trailers were drawn on the account of Ardmore at the Continental Bank in Norristown, Pennsylvania. Finally, the jury was properly instructed that in determining aggregate value consideration should only be given to trailers sold across state lines. The court instructed:

"It is not necessary for the government to prove that a specific defendant personally transported any trailers or knew that any trailers would be transported in interstate commerce. It is sufficient if he willfully and knowingly conspired with one or more persons to cause or induce the transportation of stolen trailers and that thereafter certain trailers of a total value of more than $5,000 were transported across state lines pursuant to the conspiracy."

## VI. THE TRIAL COURT DID NOT ERR IN ITS RULING ON THE TESTIMONY OF VARIOUS WITNESSES.

Bastone and Veal both allege that they were denied a fair trial because of various prejudicial statements made by certain witnesses. Initially we note that a reviewing court normally allows a certain amount of discretion to the trial court. The trial judge is in the best possible position to observe the events of the "living courtroom", the demeanor of witnesses, the strategy of counsel, the impact of certain testimony on the jury due to the surrounding circumstances.

 The defendants initially sought a mistrial because Schoenneman testified that he was in the protective custody of the government. However, this fact was brought out by the defense and was nei-

---

**11.** Twenty-three of the twenty-four trailers sold to Shulman (Ardmore) were shipped interstate to New Jersey. In addition to the local sales involving Olympic Freight Ways (Mary Ann Bakeries), Phillips, Svehla, Liberty and Totoni, and the interstate sales involving Shulman (Ardmore), there were additional interstate sales to Cumberland Wooden Chairs Co., Somerset, Ky., and G.M. Leasing Co., Tucker, Georgia.

ther elicited nor suggested by the government. There appeared no prosecutorial intent to prejudice the case against the defendant.

Next, Dean Athas testified that Bastone threatened to break his legs should he tell anyone else about his working arrangement. This statement was admitted as an exception to the hearsay rule because it was a statement by a co-conspirator in furtherance of the conspiracy, i. e., to keep the conspiracy concealed by avoiding conversations. Co-conspirator statements made in furtherance of the conspiracy are generally admissible as an exception to the hearsay rule. *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); *United States v. Lawler,* 413 F.2d 622 (7th Cir. 1969), *cert. denied,* 396 U.S. 1046, 90 S.Ct. 698, 24 L.Ed.2d 691 (1970); *United States v. Kahn, supra.* We are not convinced that this statement was properly admitted under the co-conspirator exception to the hearsay rule. But the government offers alternative theories for admissibility, specifically that the threat showed a criminal motive or evidenced a tendency to commit similar act or crimes, citing *United States v. Hutul,* 416 F.2d 607, 624 (7th Cir. 1969); *United States v. Marine, supra; United States v. Campagna,* 146 F.2d 524, 530 (2d Cir. 1945). We believe that this statement was admissible. The question of admissibility is really academic because the defense did not make a timely objection to the testimony and in fact used this subject matter as a basis for a somewhat successful impeachment of the witness.[12]

After the government presented its case, co-defendant Jackson took the stand. On cross-examination by the

government he denied that he carried a gun all his life. This statement was in contradiction to a previous, tape recorded statement made by Jackson and presented by the government earlier in the trial. Counsel for both defendants objected to this testimony and made motions for mistrial and severance on the basis that this testimony about a co-defendant clearly showed the prejudicial effect of the joinder of all defendants.

Recently the court faced the same problem in *United States v. Robinson,* 503 F.2d 208 (7th Cir. 1974) wherein the defendant alleged error in denial of his severance motion and asserted prejudice from his co-defendant's impeaching testimony on cross-examination pertaining to the witness' prior felony convictions and narcotics activity. Nevertheless, the court held no showing of prejudice was made to warrant severance. We stated:

"Robinson's allegation that the testimony relating to Taylor's criminal record and narcotics activity prejudiced him is not sufficient to make out a showing of prejudice warranting severance. Indeed, Robinson's allegation is no more than a claim that a separate trial would have created a stronger probability for his acquittal. The mere assertion that the impact of impeachment evidence pertaining to Taylor may carry over to Robinson thereby prejudicing him is not enough to meet the difficult burden imposed on a party seeking to establish prejudicial joinder" (503 F.2d at 215).

The trial court was cognizant of the potential problem created by this testimony. The judge instructed the jury that the conversation was to be considered only against the speaker when it was first introduced and again during the final instructions.[13]

---

**12.** Athas' credibility as to this statement was substantially impeached when he admitted on cross-examination that, although he had many previous and lengthy interviews and interrogations with federal agents, he never mentioned defendants alleged threat to him until several weeks before trial. Despite this effective impeachment the defendants maintained that

the jurors heard Athas' testimony and that they were prejudiced by it.

**13.** The court stated:
"I have instructed the jury not to consider it with respect to any other defendant.
\* \* \* \* \* \*

Probably the most significant issue raised on appeal involving witness testimony arises out of two references to Veal being in trouble with the authorities.[14] Veal challenges this testimony as being tantamount to remarks concerning a prior criminal record which was not an issue properly before the jury. Veal's counsel did not object to Schoenneman's testimony but he did make a motion for a mistrial. However, the court did instruct the jury to disregard the testimony.

 It is well established that a defendant in a criminal trial is protected under the Fifth Amendment from the prosecution inquiries into his prior criminal record as long as he does not testify on his own behalf or cause the jury to discover his past convictions through his own actions at trial. *United States v. Harrington,* 490 F.2d 487 (2d Cir. 1973); *United States v. Panczko,* 429 F.2d 683, 686 (7th Cir. 1970). In this case it was not proper for the government to elicit this type of testimony because it tends to reflect negatively upon the defendant's character which is not at issue. But, clearly, the testimony does not constitute reversible error.

First of all, the statements do not refer to a past criminal conviction of the defendant. They merely indicate surveillance by the authorities. Second, the testimony was presented in a nebulous form and the individual jurors may have drawn different interpretations. It is quite possible that the jury inferred that Veal's troubles stemmed from a government surveillance that led to his present indictment rather than any past criminal conduct. In the one instance where an objection was made, the court properly instructed the jury to disregard the statement. *United States v. Fonseca,* 490 F.2d 464, 469 (5th Cir.), *cert. denied,* 419 U.S. 1072, 95 S.Ct. 660, 42 L.Ed.2d 668 (1974); *United States v. Roland,* 449 F.2d 1281, 1282 (5th Cir. 1971); *United States v. Panczko, supra.*

---

The jury will be instructed again, and they have been instructed that this particular evidence is only admissible against the defendant who is on the stand. They will be instructed to only admit conversations between a defendant and someone else if they were in furtherance of an alleged conspiracy as far as any other defendant is concerned.

**14.** The statements made by the witnesses are as follows:

"Q. Just prior to your meeting with Grey, Carmen and Salvatore did you have a conversation with Art Veal?

[Answers by witness Schoenneman]

A. Yes, I did.

Q. When, approximately, was that?

A. This was in the summer of 1971.

Q. Where did that conversation take place?

A. I called Grey at his place of business.

Q. Are you talking about Grey or Veal at this point?

A. I mean Veal, I am sorry. I called Art Veal at his place of business.

Q. Would you relate that telephone conversation.

A. Art Veal told me that he had some heat around his place. I asked him if things were bad, if we would have to stop doing business. He said, no, not at this time, the heat wasn't too bad."

The colloquy involving Murray occurred as follows:

"Q. What was said during this conversation?

[Answers by witness Murray]

A. I asked Mr. Schoenneman who I should see at the place, this place called Artco, in regard to getting minor repairs done on the trailers I was picking up. A tire would be flat, a lens missing from a light or something. I wanted to know who to see there to take care of these things so I could pull them on the road. Mr. Schoenneman told me that the place was run by a colored fellow who was getting into some trouble and I should stay away from him. There was no one there to authorize to perform any type of repairs.

MR. ROTENBERG: I object to this conversation and move for a mistrial.

THE COURT: I do not see how this could be in furtherance of any conspiracy. I will strike the answer.

MR. ROTENBERG: And instruct the jury to disregard it?

THE COURT: I will instruct the jury to disregard the answer, the conversation with Mr. Schoenneman. It is not proper testimony."

One final contention made by Veal and Bastone in regards to witness testimony is that their constitutional rights to confront witnesses presented against them and a fair trial were violated by the admission of certain hearsay evidence. It is questionable whether the testimony cited amounts to hearsay, but assuming *arguendo* that it is hearsay it falls under the exception to the rule as statements of a co-conspirator in furtherance of the conspiracy. *Krulewitch v. United States, supra.*

## VII. THE COURT'S INSTRUCTIONS TO THE JURY WERE PROPER.

■ The question of whether to give the jury a cautionary instruction addressed to the intrastate transactions depends on one's interpretation of the evidence. Defendant Veal contends that the local transactions were relevant only as prior, concurrent, or subsequent similar acts. On the other hand the government argues that the local transactions were overt acts in furtherance of the conspiracy. A review of the evidence discloses that certain transactions Veal disputes were in fact interstate. The testimony dealing with the local sales was proper because it showed the identity of the parties in the conspiracy, its funding, and its operation by which the trailers were stolen, cleaned, retitled, and sold. Thus it was admissible to demonstrate the existence and operation of the conspiracy. Contemporaneous overt acts not charged in the indictment may be shown if they are performed in connection with the named acts, and, are done to further the conspiracy. *United States v. Clay,* 495 F.2d 700, 705–07 (7th Cir. 1966); *United States v. Armone,* 363 F.2d 385, 400 (2d Cir. 1966).

■ It is important to note that Veal failed to offer an instruction on the basis of a similar acts theory. Consequently we will not reverse unless there is a showing of plain error. *Federal Rules of Criminal Procedure* 30 and 52(b). See *United States v. Gardner,* 516 F.2d 334, 346 (7th Cir. 1975); *United States v. De-*

*mopoulos,* 506 F.2d 1171, 1180 (7th Cir. 1974); *United States v. Lisowski,* 504 F.2d 1268, 1272–74 (7th Cir. 1974); *United States v. Howard,* 139 U.S.App.D.C. 347, 433 F.2d 505, 508–12 (1970).

Next, Bastone states that the trial court committed prejudicial error in failing to give a portion of an instruction which he offered. Bastone's instruction No. 17 read:

"You are instructed that mere knowledge, approval of or acquiescence in the object or purpose of a conspiracy, without an intention and agreement to cooperate in the crime is not sufficient to make one a conspirator."

The trial court gave this instruction except for the words "or acquiescence in" which it deleted, stating:

"I think the word 'acquiescence' is maybe a little bit ambiguous for the jury. Let's say 'the mere knowledge or approval of the object or purpose', and I think that will cover the matter."

■ A defendant in a criminal trial is always entitled to have the jury instructed on his theory of defense if it is properly presented and has some basis in the evidence presented. In this case the other instructions given to the jurors adequately told them what type of involvement was necessary to find the defendants guilty of conspiracy.

■ The trial judge's editing of the instruction appears to be an attempt to clarify and elucidate. It is the duty of the trial judge to avoid instructions which are confusing and would tend to direct the jury's attention away from the issues they are called upon to decide. *United States v. American Radiator & Standard Sanitary Corp.,* 433 F.2d 174, 189 (3d Cir. 1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971). The deletion was certainly within the court's discretion and, in light of the other instructions, does not constitute error.

■ Turning to the other instructions Veal maintains that the instructions on the issues of withdrawal and the admis-

sibility against him of post-withdrawal conversations of co-conspirators were insufficient. In order to withdraw from a conspiracy one must take an affirmative step to disavow or defeat the purpose of the conspiracy. *United States v. Cirillo,* 468 F.2d 1233, 1239 (2d Cir. 1972); *United States v. Chester,* 407 F.2d 53, 55 (3d Cir. 1968); *Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1911). In this case there is no evidence that Veal took an affirmative step to withdraw from the conspiracy. To the contrary, his cessation of activity with the other indicted co-conspirators was due to the fact that he was having "troubles" with law enforcement officials and thus was required to "lay low" for awhile. The cases cited by Veal in support of his claim that the jury should have been instructed to disregard certain conversations are clearly inapplicable. They involved situations wherein the conspiracy was already over and thus the declarations made could not be in furtherance of the scheme. Furthermore, the court instructed the jury at the close of one witness' testimony as follows:

> "[T]he jury is not to consider the evidence if they find that the individual, any individual, including Mr. Veal, had withdrawn from the conspiracy at the time of the occurrences that were testified to."

## VIII. THE DEFENDANTS' RIGHT TO A FAIR TRIAL WAS NOT VIOLATED BY THE PROSECUTION'S FINAL ARGUMENT.

In final argument counsel for the government commented upon the failure of the defense to call certain witnesses.[15] The prosecutor's rebuttal argument was justified because counsel for Bastone continuously went outside the record in his closing argument referring to witnesses the government failed to call.[16] He persisted in this trial tactic

---

**15.** By Mr. Burns, the prosecutor:

"It was also stated that the Government failed to call certain individuals. I guess they were inferring that had we called them, those people would have testified differently and said this simply didn't happen. Well, I think they mentioned Vince Auriemma. Well, Vince Auriemma is Carmen Bastone's friend. He could have called him just as easy as we could. Harry Mizok, he is an unindicted co-conspirator—

MR. COLLINS [attorney for defendant C. Bastone]: Objection, your Honor. The defendants are not required by law to call any witnesses.

THE COURT: Sustained.

MR. BURNS: Your Honor, I submit that the defendants have the same subpoena power and I am allowed to argue that.

MR. COLLINS: I object.

MR. BURNS: That is an invited response.

MR. COLLINS: Motion for mistrial.

THE COURT: Well, there has been no evidence as to whether this man is even alive. I will sustain the objection.

MR. BURNS: I believe there was also mention of a man named Joe DeVita. Well, I would state on that they could have subpoenaed Joe DeVita just as easy as we could have.

MR. COLLINS: Objection, your Honor. We are not required to subpoena anybody.

THE COURT: Sustained. There has been no evidence of where these people are.

MR. BURNS: Well, your Honor, you let him argue and this is simply invited response.

THE COURT: I am sustaining his objection.

MR. BURNS: All right, I am sorry."

**16.** Counsel for Bastone made the following arguments:

"What independent evidence is there? Well, they started talking about the meeting that is supposed to have happened where Carmen Bastone and a man named Auriemma were sitting around talking and Ron Schoenneman was there and there was some evidence, although it wasn't mentioned in argument, about some other fellow named Lew. Well, they didn't call those people to testify. They could have been, the Government has the right to call anybody they want to and it is their burden of proof.

\* \* \* \* \* \*

Who were the thieves? Quagliato and Marino? Did Marino testify? Do you remember seeing him? He wasn't here. He is under indictment in this very case, but was he here? No.

\* \* \* \* \* \*

The Government can call anybody they want to this stand. Nobody told the Government that they cannot do anything. They can listen to your phone calls, they can serve subpoenas, they can do anything they want to do. They never called John Falcione to the stand to say 'Yes, Carmen and me, we went to do the Shulman deal'. They never called him.

despite government objection. Bastone's counsel necessitated a response by government counsel seeking to fairly explain the alleged weaknesses in the government's case. Under this circumstance, where there is an invited response, such comments have been previously approved by this court. *United States v. Nowak,* 448 F.2d 134, 140–141 (7th Cir. 1971); *United States v. Lawler,* 413 F.2d 622 (7th Cir. 1969); *United States v. Wright,* 309 F.2d 735, 736–9 (7th Cir. 1962).

Accordingly the defendants' convictions are affirmed.

Affirmed.

MR. BURNS: Your Honor, I will object to this line of argument of Mr. Collins.

THE COURT: Sustained.

MR. COLLINS: If the Court please—well— The prosecutor had this Mr. T. G. Grey and they claim Carmen went out there once. Mr. Grey didn't come in and say that. The only person who said that was Ron Schoenneman, that is the only one who said it. They had all of these different points where there were people who could testify to it if it were true, other people, third party people, people like Mr. Loman, people like Bobby Quagliato, people who could say, 'Yeah, I saw Carmen there, he did it.'

\* \* \* \* \* \*

The Government mentioned in this case a Harry Mizok who was charging three percent for cashing big checks. That would be $90 for a $3,000 check. They didn't call him to the stand, but Schoenneman said that this is what he did and he is a defendant."