**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Joseph W. NOWAK, Defendant-Appellant.**

**No. 18338.**

United States Court of Appeals, Seventh Circuit.

July 26, 1971.

Rehearing Denied Oct. 5, 1971.

Anna R. Lavin, Chicago, Ill., for defendant-appellant.

Wm. J. Bauer, U. S. Atty., Chicago, Ill., Edward Fenig, Crim. Div., Dept. of Justice, Will Wilson, Asst. Atty. Gen., Washington, D. C., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and FAIRCHILD and STEVENS, Circuit Judges.

SWYGERT, Chief Judge.

Defendant-appellant, Joseph W. Nowak, appeals his conviction of having participated in a conspiracy to violate four sections of the criminal code (18 U.S.C. §§ 657, 1001, 1006, 1008) in violation of 18 U.S.C. § 371. After having been found guilty by a jury, he was sentenced to three years imprisonment.

Since the sufficiency of the evidence is not questioned, a brief résumé of the facts will suffice.[1] In 1960 Vernon Sherman as an entrepreneur wished to develop a tract of land near Chicago into homesites with an adjoining golf course, swimming pool and clubhouse to be known as Riverwoods Country Club. To obtain financing he contacted John Perisich, a mortgage broker, who for a fee agreed to help. Perisich, in turn, contacted Service Savings and Loan Association, a federally insured state-chartered institution in Summit, Illinois. Service agreed to finance the Riverwoods project on the condition that Perisich would arrange with money brokers (persons who for a fee engage in the business of directing deposits of money into a financial institution) to deposit sufficient money in Service for the Riverwoods loan.

Defendant Nowak was Service's attorney and his co-defendant, William Szarabajka, was its president.[2] During 1961 Nowak worked out the plans for the Riverwoods loan, including the acquisition of the deposits brokered by Perisich, so that Service would have the funds to finance a $3,100,000 loan. One of the reasons for making the loan was to enable Service, from its retention of prepaid interest and other charges, to pay its August 31, 1961 semi-annual dividend to depositors.

The loan was completed in June 1961 on an appraisal of $8,000,000 placed on the contemplated project by one Mulhern who was told by Nowak to prepare the appraisal on data supplied by Sherman. Sherman refused to submit any information concerning his personal financial responsibility. The actual value of the project approximated $2,500,000. Sherman expended nearly two million dollars of the mortgage money before any construction was started. These expenditures included the payment of an interim mortgage of $1,200,000 which codefendant Morris had arranged and $186,000 to Perisich for obtaining the loan and for payments to money brokers for depositing funds with Service. Sherman also gave Perisich $93,000 in cash from the proceeds of the loan. Perisich in turn handed Nowak approximately $72,000. Because of these and other payments Sherman was left without sufficient funds to complete construction.

Although no payments were made to retire the loan, Service in January 1963 increased the Riverwoods indebtedness by $700,000. This was accomplished by the granting of a new loan of $3,800,000 and the canceling of the original loan. The new mortgage papers were prepared by Nowak. To obtain money for the increased amount, Sherman arranged and paid for brokered deposits to be placed with Service. Edward Szarabajka, Service's vice-president, handled the funds received through the money brokers. In so doing he directed his secretary not to make notations on the depositors' account cards as to the source of the funds, but instead to make secret monthly lists of brokers who sent in deposit accounts. In March 1964, when regulatory examiners were at Service he repeated his instructions to her to keep the existence of the lists secret, pursuant to directions by both Nowak and president Szarabajka.

By 1961 the Federal Savings and Loan Insurance Corporation (FSLIC) considered the use of brokered deposits by savings and loan associations to make loans as against its interest, as such deposits are expensive to acquire, volatile and apt to affect the liquidity of the associations. At that time the Federal Home Loan Bank Board issued a regulation which required insured institutions

---

1. Defendant concedes that the proof was sufficient to support conviction of a conspiracy to violate 18 U.S.C. §§ 657, 1006 if Congress has continuing constitutional authority to enforce those statutes and if the statute of limitations had not run.

2. Szarabajka was convicted along with appellant, but has not appealed his conviction. Jerome S. Morris, Sherman's attorney, a third indictee, was severed from trial.

to report brokered deposits and limited the volume of such deposits to a percentage of an association's total capital.

The Board, during 1961–1963, directed various inquiries to Service. Nowak as attorney for Service prepared the answers which were then signed by officers of the association. The answers were false in that they recited that Service had no knowledge of commissions being paid to brokers for deposits, that no money broker had been used to obtain funds for the Riverwoods loan, and that Sherman's financial statement had been seen by the defendant in 1961 and found to be satisfactory.

### I

■ Defendant contends that 18 U.S. C. §§ 657, 1006, 1008 are unconstitutional when applied to state-chartered institutions insured by FSLIC. He argues that since "the original constitutional basis for legislation controlling FSLIC * * * (the appropriation of Treasury moneys) no longer exists," the necessary constitutional nexus between state-chartered insured institutions and valid federal criminal legislation touching such institutions is lacking.

An examination of the origin and purposes of FSLIC demonstrates that defendant's contention is untenable. In 1934 as part of the National Housing Act, FSLIC was created as a vehicle to insure the safety of private investment in savings and loan associations in order to strengthen the savings and loan industry and thereby promote the financing of homes and the encouragement of savings. Congress directed the Home Owner's Loan Corporation to subscribe for all of FSLIC's $100,000,000 of capital stock. In 1950 Congress determined that FSLIC's resources had reached a point where some plan for the retire-

ment of the initial $100,000,000 capital contribution might safely be implemented. Accordingly, Congress added subsections (h) and (i) to 12 U.S.C. § 1725; these provided for the gradual retirement of FSLIC's capital stock and authorized FSLIC to borrow up to $750,000,000 from the United States Treasury. By 1958 FSLIC had retired its entire capital stock. At its creation, FSLIC was designated an instrumentality of the United States. 12 U.S.C. § 1725(c), and it has since been designated an "agency of the United States," 12 U.S.C. § 1730(k) (1). *See also,* 12 U.S. C. § 1437(b). FSLIC is under the direction of and is operated by the Federal Home Loan Bank Board which is also an agency of the United States, 12 U.S.C. § 1437(b).

Defendant admits, as he must, that the creation of FSLIC was a valid exercise of congressional power to appropriate funds and to legislate in aid of the "general welfare." U.S.Const. art. I, § 8, cl. 1. *Cf.* Helvering v. Davis, 301 U. S. 619, 640, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); First Federal Savings & Loan Ass'n v. Loomis, 97 F.2d 831, 839 (7th Cir. 1938), petition for cert. dismissed, Martin v. First Federal Savings & Loan Ass'n, 305 U.S. 666, 59 S.Ct. 363, 83 L. Ed. 432 (1939); Langer v. United States, 76 F.2d 817, 825 (8th Cir. 1935). Defendant contends, however, that because the United States no longer has a financial stake in FSLIC, it has become "a well organized private industry, supported and owned by the organization[s] it insures." This argument has no merit.

That FSLIC has returned all of the capital contributed by the United States and has no outstanding stock does not mean that the United States no longer "owns" FSLIC.[3] Congress may use any appropriate vehicle to promote constitu-

3. We note that Congress, in the Government Corporation Control Act, has designated FSLIC a "wholly owned Government Corporation," 31 U.S.C. § 846, and in Acron Investments, Inc. v. FSLIC, 363 F.2d 236, 240 (9th Cir.), cert. denied,

385 U.S. 970, 87 S.Ct. 506, 17 L.Ed.2d 434 (1966), the court indicated that it believed the United States continues to "own" FSLIC. Cf. Cassata v. FSLIC, 445 F.2d 122 (7th Cir. 1971).

**138**

tionally permissible ends. M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 422, 4 L.Ed. 579 (1819). If it chooses to make use of a "corporation," Congress is not limited by traditional notions of corporate powers and organization but may mold its vehicle in any way which appears useful to the accomplishment of the legislative purpose. Thus Congress need not capitalize corporate instrumentalities of the United States in any rigidly prescribed manner. Congress need not provide for formal evidence of ownership but, having created the corporate instrumentality, may designate the United States "owner" and continue to regulate and control the instrumentality so long as it is acting in furtherance of some valid constitutional purpose.[4]

Congress has created a complex structure of interrelated instrumentalities to regulate and promote the banking industry. Its power to create this system has been consistently upheld;[5] and "the power to inaugurate such systems and to create such institutions carries with it inevitably the power to preserve and protect them." Weir v. United States, 92 F.2d 634, 636 (7th Cir.), cert. denied, 302 U.S. 761, 58 S.Ct. 368, 82 L.Ed. 590 (1937). See also Doherty v. United States, 94 F.2d 495, 498 (8th Cir.), cert. denied, 303 U.S. 658, 58 S.Ct. 763, 82 L.

Ed. 1117 (1938). Nothing in the Constitution suggests that Congress must make continuing appropriations to have this power. Congress may use necessary and proper means of promoting the general welfare, and if money is needed for that purpose, Congress may use public funds. But it is wrong to suggest that if certain steps in aid of the public welfare may be taken without the use of such funds, Congress is powerless to take those steps.

Finally, we note that Congress has authorized the Secretary of the Treasury to employ FSLIC as a depositary of public money and a fiscal agent of the United States, 12 U.S.C. § 1725(d). That Congress has the power to create corporations to act as fiscal agents of the United States was squarely affirmed in Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921).[6] That case established that the Secretary of the Treasury need never have exercised his power to designate the corporation a fiscal agent and that courts may not inquire into the motives of Congress in creating such corporations. Congress' judgment that FSLIC should be available to act as a fiscal agent of the government is sufficient in itself to support continuing government regulation of FSLIC's operations.

---

4. Defendant argues that, aside from the question of ownership, no public funds are committed to FSLIC. But the United States does have a financial stake in FSLIC in the form of a contingent liability. In 1950 Congress authorized the Treasury to loan $750,000,000 to FSLIC. Defendant argues that Congress has no power to insure the appropriation of money in the future and that the "promise" made in 1950 of a $750,000,000 loan fund is not binding on future Congresses. While it is true that Congress cannot insure future appropriations, it has not attempted to do so but has simply authorized loans. This authorization remains effective until repealed.

5. See, e. g., M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 422, 4 L.Ed. 579 (1819); Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921); Westfall v. United States, 274 U.S. 256, 47 S.Ct. 629, 71 L.Ed. 1036

(1927); Hiatt v. United States, 4 F.2d 374 (7th Cir. 1924), cert. denied, 268 U.S. 704, 45 S.Ct. 638, 69 L.Ed. 1167 (1925); United States v. Kay, 89 F.2d 19 (2d Cir. 1937), vacated on other grounds, 303 U.S. 1, 58 S.Ct. 468, 82 L. Ed. 607 (1938); Weir v. United States, 92 F.2d 634 (7th Cir.), cert. denied, 302 U.S. 761, 58 S.Ct. 368, 82 L.Ed. 590 (1937); First Federal Savings & Loan Ass'n v. Loomis, 97 F.2d 831 (7th Cir. 1938), petition for cert. dismisesd, 305 U.S. 666, 59 S.Ct. 363, 83 L.Ed. 432 (1939).

6. See also Langer v. United States, 76 F. 2d 817 (8th Cir. 1935); Doherty v. United States, 94 F.2d 495 (8th Cir.), cert. denied, 303 U.S. 658, 58 S.Ct. 763, 82 L.Ed. 1117 (1938); First Federal Savings & Loan Ass'n v. Loomis, 97 F.2d 831 (7th Cir. 1938), petition for cert. dismissed, 305 U.S. 666, 59 S.Ct. 363, 83 L.Ed. 432 (1939).

## II

Defendant contends that his conviction was barred by the running of the statute of limitations. 18 U.S.C. § 3282. He argues that the conspiracy ended more than five years before February 6, 1969, the date the indictment was returned, and that, in any event, he had withdrawn from the conspiracy sometime in 1963.

Defendant says that the object of the conspiracy was achieved by the end of 1963 since by that time the misapplication of the association's funds, accomplished by means of the Riverwoods loan, had occurred. He relies on the rule that once the object of a conspiracy has been attained, the conspiracy terminates and no subsidiary conspiracy to conceal the crime may be inferred from evidence showing merely that the conspirators took steps to avoid apprehension. Grunewald v. United States, 353 U.S. 391, 399–406, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). But the defendant takes too narrow a view of the scope of this conspiracy. "The duration of a conspiracy * * * depends upon the scope of the agreement entered into by its members." United States v. Hickey, 360 F.2d 127, 141 (7th Cir.), cert. denied, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966). The indictment charged, and the Government proved, a broad and continuing conspiracy to misapply the funds of Service and to make false and fraudulent statements to an agency of the United States. The second aspect of the conspiracy was not simply an agreement to conceal the misapplication of Service's assets; it involved a continuing agreement to commit independent criminal acts by giving false answers to questions by federal regulatory examiners concerning Service's use of brokered accounts. As long as any of the conspirators engaged in overt acts in furtherance of this scheme, the conspiracy continued. See Tousie v. United States, 397 U.S. 112, 122, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). There was sufficient evidence from which the jury could infer that a plot to deceive the government existed until after February 6, 1964.

Conviction requires proof "that the conspiracy still subsisted within the [five] years prior to the return of the indictment, and that at least one overt act in furtherance of the conspiratorial agreement was performed within that period." Grunewald v. United States, supra, at 970. The indictment alleged as overt acts that at the end of February 1964 the conspirators caused Service to pay its regular semi-annual dividend on deposits including those obtained from money brokers and thereafter to repay certain of the deposits obtained from these brokers. There was sufficient proof that these alleged overt acts occurred after February 6, 1964 and that they were in furtherance of the conspiracy.

Defendant contends that even if the conspiracy remained in existence after February 6, 1964, he had withdrawn from it months before that date and that, accordingly, the statute of limitations had run as to him. Defendant relies on the fact that he resigned from his activities as Service's attorney on September 19, 1963 and argues that from that point on he no longer acquiesced in the continuation of the illegal scheme. But defendant's actions were not sufficient to constitute a withdrawal. As the district judge instructed the jury, withdrawal requires some affirmative action tending to defeat or disavow the purpose of the scheme, and the abandonment must be complete and in good faith. Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); United States v. Beck, 118 F.2d 178, 184–185 (7th Cir.), cert. denied, 313 U.S. 587, 61 S.Ct. 1121, 85 L. Ed. 1542 (1941); Blue v. United States, 138 F.2d 351, 360 (6th Cir. 1943), cert. denied, 322 U.S. 736–737, 64 S.Ct. 1046, 88 L.Ed. 1570 (1944).

There was evidence showing that defendant continued to engage in overt acts in February or March 1964. Edward Szarabajka testified that de-

fendant and William Szarabajka instructed him to remind his secretary of the need to keep secret the lists containing the sources of brokered funds. Defendant complains that this overt act was not pleaded. But any overt act by a conspirator may be used to prove the existence of the scheme and that conspirator's connection with it. *See, e.g.,* Reese v. United States, 353 F.2d 732, 734 (5th Cir. 1965). Once the conspiracy is proved to have continued into the limitations period, any overt act, whether or not pleaded, may be used to show a defendant's connection with the scheme. The jury properly found that defendant had not withdrawn from the conspiracy.

■ We have considered and find without merit defendant's complaints concerning the district judge's instructions. The judge read to the jury the overt acts alleged in the indictment and instructed that the Government must prove that "at least one overt act as set forth in the indictment was committed * * * and * * * that one or more of the overt acts occurred after February 6th, 1964." This was a sufficient instruction on the statute of limitations defense.

### III

Defendant's final contention is that he was denied a fair trial because of certain comments by the trial judge and conduct of the prosecutor which were allegedly improper.

The record shows that there were occasional instances where the district judge exhibited impatience with defense counsel. In addition, the judge once stated that a witness had given the same response to identical questions so often that the judge was "beginning to believe" the answer.

■ A trial judge has the power and the duty to oversee the presentation of the evidence so that the issues will be clearly presented to the jury and the

case will not become bogged down in a morass of inconsequential detail. *See* United States v. Godel, 361 F.2d 21, 24 (4th Cir.), cert. denied, 385 U.S. 838, 87 S.Ct. 87, 17 L.Ed.2d 72 (1966). Further, "admonition of counsel in hotly contested cases * * * sometimes becomes requisite, even essential." Bursten v. United States, 395 F.2d 976, 983 (5th Cir. 1968). In exercising his duty to control the presentation of the evidence, however, the trial judge must remain temperate and judicial and not engage in personal disparagement of counsel.

■ We are satisfied that when the judge's statements are viewed in connection with the entire record, they are not of such significance as to have impaired any substantial right of the defendant. *See* United States v. Coduto, 284 F.2d 464, 468 (7th Cir. 1960), cert. denied, 365 U.S. 881, 81 S.Ct. 1027, 6 L.Ed.2d 192 (1961).

The judge's expression of belief in the witness' answer was not prejudicial. As far as we can discover from the transcript, the remark was not intended to be taken seriously. This was not a "definite and concrete assertion of fact * * * made with all the persuasiveness of judicial utterance" such as the Supreme Court considered in Quercia v. United States, 289 U.S. 466, 472, 53 S. Ct. 698, 77 L.Ed. 1321 (1933). Further, the judge immediately instructed the jury that whatever he believed should be ignored by them. We do not believe this "expression of belief" could possibly have influenced the jury.

■ The final complaint concerns the prosecutor's closing argument. Defense counsel had argued that the crux of the Government's case was based on the uncorroborated testimony of Perisich and that the Government had not called other potential witnesses because they would have contradicted Perisich.

In response, the prosecutor stated:

> [Government lawyers] don't put witnesses on the stand and expect you to believe things just because they said it.
>
> Just a word about calling witnesses. We didn't call Mr. Van Buskirk, we didn't call Vernon Sherman, and they were under subpoena to the Government.
>
> * * * * * *
>
> There were all sorts of reasons, ladies and gentlemen, why the Government, the Government of the United States, would decide not to put a witness on the stand.
>
> The law is, ladies and gentlemen, that when a party puts a witness on the stand, he vouches for what that person says. He stands behind his testimony as to truth. That's why the— [objection] * * *.

Although it is arguable that this statement might have been interpreted by the jury as an expression of the prosecutor's personal belief in the honesty of those witnesses who had testified for the Government, which would be highly improper, we think that it was meant, and could logically be interpreted, as merely a response to the argument made by defense counsel regarding the lack of corroboration of the witness Perisich. An advocate is permitted considerable latitude in replying to his opponent's arguments. United States v. Lawler, 413 F. 2d 622, 628 (7th Cir. 1969), cert. denied, 396 U.S. 1046, 90 S.Ct. 698, 24 L.Ed.2d 691 (1970). Accordingly, we do not consider the statement so prejudicial as to require a reversal.

Since the other allegedly improper remarks by the prosecutor were even less likely to have prejudiced the defendant, we do not think they need be identified or further discussed.

The judgment of conviction is affirmed.