UNITED STATES of America,
Plaintiff-Appellee,

v.

Fred T. MACKEY, Defendant-Appellant.

Nos. 77–1074 and 77–1978.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 7, 1977.
Decided Feb. 22, 1978.

Before CUMMINGS and SPRECHER, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

SPRECHER, Circuit Judge.

The case involves a large number of alleged errors by the district court in a criminal trial where the defendant was convicted both of attempted tax evasion in violation of 26 U.S.C. § 7201 and conspiracy to evade the payment of taxes in violation of 18 U.S.C. § 371. Defendant's chief arguments deal with the admissibility of the hearsay declarations of a co-conspirator not on trial, the propriety of some of the prosecutor's closing remarks and the failure of the prosecution to provide materials that might have been used by the defendant to impeach one of the prosecution's main witnesses.

I

This case involves two consolidated appeals arising out of the same district court case. Initially, defendant appeals his convictions for tax evasion and conspiracy on the basis of numerous assigned errors at trial. Defendant also appeals the district court's denial of his motion for a new trial based on "newly discovered" evidence that defendant claims was subject to disclosure by the government under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and/or the Jencks Act, 18 U.S.C. § 3500. The facts underlying the convictions will be discussed first and those relevant to the motion for a new trial will be described subsequently.

A

The defendant, Fred T. Mackey, and his alleged co-conspirator, F. Lawrence Anderson, were charged in a five count indictment. Count I charged the defendant with conspiracy to evade payment of income tax and to defraud the United States by impeding the Internal Revenue Service in the collection of revenue in violation of 18

Harvey M. Silets, Chicago, Ill., for defendant-appellant.

Charles E. Brookhart, Myron C. Baum, Abraham M. Poretz, Tax Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

* Senior District Judge William J. Campbell, of the Northern District of Illinois, is sitting by designation.

U.S.C. § 371.[1] Count II charged the defendant with attempted tax evasion in violation of 26 U.S.C. § 7201.[2] Count III charged the defendant with subornation of perjury in violation of 18 U.S.C. § 1622.[3] Counts IV and V of the indictment related only to F. Lawrence Anderson.[4]

The claims in the indictment stem from a series of events subsequent to a $2,488,712 stipulated settlement of June 5, 1972, between the defendant and the Internal Revenue Service in a civil case before the Tax Court for back taxes and penalties for the period from 1954 through 1961 and 1963 through 1965. It was this large sum of money due and owing the federal government that the prosecution claims the defendant conspired and attempted to avoid paying.

The defendant's trial lasted for over a week, during which the prosecution presented 34 witnesses and over 100 documents. In turn, the defendant presented three witness on his behalf. Since we cannot describe all of the evidence presented at trial without unduly prolonging this opinion, we will focus on the important points in the government's and defendant's cases.

The prosecution presented evidence as to six affirmative acts of attempted tax evasion committed by the defendant. First, the prosecution showed that the defendant had substantial control over three companies, Gibraltar Mutual Insurance Company, Gibraltar Industrial Insurance Company and M.W.E. & S. Investment Company (M.W.E. & S.), and that he manipulated them so that most of the assets of the three were kept in M.W.E. & S. which left them potentially at the defendant's disposal. Second, the prosecution presented evidence that several checks of M.W.E. & S. were used to purchase personal goods and services for the defendant, and therefore, a bank account at the Gary National Bank placed in the company's name may have been "fictitious." Third, the defendant was shown to have made substantial purchases in cash, the source of which was generally unknown. Fourth, the prosecution presented evidence that defendant used money from M.W.E. & S. and the insurance companies to pay for various personal items, including, among other things, a security system and swimming pool for the defendant's home. Fifth, the prosecution showed that defendant had kept mortgages on his property, notwithstanding that there was no money due and owing to anyone. Finally, it was shown that defendant had placed his assets with another person and company by giving $25,000 in cash to a Carl Smith to invest in a company named A & D Realty, Inc. (A & D).

The prosecution's conspiracy charge is somewhat more complex. It revolves around the formation by F. Lawrence Anderson, defendant's co-conspirator, and Robert F. Deal, defendant's nephew by marriage, of A & D, which purchased the de-

---

1. That section provides:

 If two or or more persons conspire either to commit any offense against the United States, or to defraud the United States . . . in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 18 U.S.C. § 371.

2. That section provides:

 Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.
 26 U.S.C. § 7201.

3. That section provides:

 Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined not more than $2,000 or imprisoned not more than five years, or both.
 18 U.S.C. § 1622.
 The district court directed a verdict in favor of the defendant on this count of the indictment. Nonetheless, its inclusion at the trial is claimed as a basis for reversal. See part VII of this opinion infra.

4. F. Lawrence Anderson was severed from defendant's trial due to ill health. He was subsequently tried and acquitted of all charges against him in the indictment.

fendant's home from the IRS.[5] It was the prosecution's theory that A & D was created for the defendant's benefit so that his resources could be placed secretly in A & D and thereby be protected from collection by the Internal Revenue Service. The defendant claimed that A & D was a legitimate realty company with bona fide investors. The prosecution presented three key witnesses on the conspiracy count who were purportedly shareholders in A & D, but who testified that they, in fact, had not invested their own money in the enterprise. Carl Smith, a pharmacist in a building owned by defendant, testified that he was initially contacted by Mr. Anderson about an "investment" in A & D Realty. He testified further that he was called by defendant to come to his office, whereupon he was given by the defendant $25,000 in cash in a paper bag and was told to purchase a cashier's check payable to A & D Realty and to take the check to Mr. Anderson. Smith testified that he did this, and that at some indeterminate time later he signed an A & D stock certificate for a $25,000 investment.

A second witness, Warren E. Dotson, an automobile tire dealer, testified that defendant Mackey had asked him about investing in A & D Realty. In response to Dotson's comment that he lacked the money to invest, defendant said that Dotson "didn't need any" (Tr. at 672–75). Subsequently, Dotson was contacted by co-conspirator Anderson who gave Dotson $12,000 in cash and told him to take it to a bank and to get a cashier's check payable to A & D Realty. Dotson returned the check to Anderson's secretary. Later, just before he was to testify before the grand jury, Dotson was invited to an A & D Realty shareholders' meeting at Anderson's house, at which time he signed the company's stockholders book and a certificate for 60 shares of its stock.[6]

The third witness, Dr. Edwin G. Moore, testified that he had been contacted by F. Lawrence Anderson about loaning Anderson money for some real estate investments. Dr. Moore agreed to do so, wrote a check payable to A & D Realty for the sum of $10,000 and took it to Anderson. In return, Dr. Moore immediately was given $10,000 in cash by one of Anderson's employees.

In addition to the evidence of a conspiracy between the defendant and F. Lawrence Anderson to have A & D Realty established and to place defendant's assets in the firm for the purpose of purchasing defendant's home, the prosecution sought to demonstrate the existence of a conspiracy to cover-up the true nature of A & D Realty. The primary evidence used was F. Lawrence Anderson's false grand jury testimony in April 1975, that Messrs. Smith and Dotson and Dr. Moore were actual investors in A & D Realty (Exhibit 33a). The concealment phase of the conspiracy was alleged to have continued until the date of the indictment.

Based primarily on the evidence described above, the jury found the defendant guilty on both the conspiracy and tax evasion counts in the indictment. The defendant appeals both convictions relying on several claimed errors by the district court during the trial.

B

As suggested above, Carl Smith's testimony that he received cash from the defendant and was told to invest it in A & D

---

**5.** The house was sold at auction in partial satisfaction of the two million dollars due and owing the IRS. It was initially purchased by an unrelated party at the first auction, but that party was unable to acquire sufficient funds to make the down payment. A & D Realty subsequently purchased the property for $136,000. The defendant continued to reside at his house throughout the entire period prior to trial.

**6.** Warren Dotson's testimony was impeached by defense counsel on cross-examination. He had testified before the grand jury that the $12,000 was his own. He subsequently was indicted and pleaded guilty to perjury. As a part of his plea bargain for probation, Dotson promised to testify against the defendant. In addition, there was some reason to believe that Dotson had received $12,000 in a loan from the Small Business Administration, and that he testified that the money had come from Anderson to conceal his misuse of that loan which is a criminal offense.

Realty was an important part of the prosecution's conspiracy case. Subsequent to the entry of judgment in this case, defense counsel discovered evidence indicating that Smith might have been involved in the trafficking of narcotics before and after he supposedly received $25,000 in cash from defendant. While investigating this possibility, defense counsel discovered that agents of the Internal Revenue Service, including one who was investigating the defendant, had interrogated Smith about his narcotics activity. The IRS had elicited from Smith, in return for possible consideration in other matters, a statement which he refused to sign without his attorney present and which, in fact, he never did sign.

Defense counsel, believing that the evidence of Smith's narcotics trafficking was significant because it was a possible source for the $25,000 Smith claimed the defendant had given him, and also because it was a source that Smith would have a strong motive to conceal, moved for a new trial under Fed.R.Crim.P. 33 based on evidence that allegedly was withheld by the prosecution.

A hearing on the motion was held. During that hearing it was shown that defense counsel had evidence of Smith's possible narcotics trafficking available to him prior to trial. Smith had been questioned before the Grand Jury by the prosecution about a previous interview he had had with the government about narcotic transactions.[7] Smith's grand jury testimony was provided to defense counsel during pre-trial discovery.

After the hearing, the court denied defendant's motion for two reasons. First, the court held that this evidence was not "newly discovered" because defense counsel could have located it had he exercised due diligence. Second, the court determined that the evidence was cumulative since it could only be used to impeach Smith's testimony which already had been impeached severely by defense counsel.[8] The defendant appeals from the district court's denial of his motion for a new trial.

.II

■ Defendant's first argument is that the district court erred in admitting, through Dr. Moore's testimony, the statement by F. Lawrence Anderson made in August 1975, that Dr. Moore's comments to the IRS would "probably send" Anderson to jail. During cross-examination, defense counsel asked Dr. Moore about various conversations he had had with Mr. Anderson. From Dr. Moore's answers, defense counsel elicited the fact that the defendant had never been present during any of their meetings.

On redirect examination, the prosecution asked about a conversation between Dr. Moore and Anderson that occurred subsequent to the former's appearance before the grand jury. Defense counsel objected on the ground that the question was beyond the temporal scope of the cross-examination. The court overruled the objection on the basis that it fell within the subject matter of the cross-examination.

■ In response to the question, Dr. Moore testified that Anderson told him that the comments to the Internal Revenue Ser-

---

7. During the grand jury testimony of Carl Smith on May 8, 1975, Smith was questioned by the prosecutor as follows:

Q. All right. Now, Mr. Smith, sometime ago, were you interviewed by a representative of Narcotics Bureau in connection with some transactions?
A. Yes, sir.
Q. All right. During that period of time did you tell this Narcotics Agent that you had no other source of income other than the salary that you received from your employment?
A. Yes, sir.

8. Smith had testified previously before the grand jury investigating the defendant that he had invested his own money in A & D Realty. In fact, he had told the same story to his wife, parents and the Internal Revenue Service. Smith was subsequently indicted and convicted for perjury based on this testimony before the grand jury. In addition, Smith was granted immunity after his perjury conviction so that he would testify again before the grand jury and at the trial.

vice agents would "probably send him [Anderson] to jail . . .." (Tr. at 771). Defendant argues primarily [9] that since the statement was made neither "in the course of" nor "in furtherance of" the conspiracy, as required by Fed.R.Evid. 801(d)(2)(E), it was inadmissible hearsay and that its admission against the defendant was prejudicial error.

It seems to us quite clear that if the conspiracy can be said to have continued up to the time of Anderson's statement to Dr. Moore then that statement was "in furtherance of" the concealment portion of the conspiracy. The standard to be applied is whether some reasonable basis exists for concluding that the statement furthered the conspiracy. *See United States v. Moore,* 522 F.2d 1068, 1077 (9th Cir. 1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976); *United States v. Knippenberg,* 502 F.2d 1056, 1061 (7th Cir. 1974). While the statement is susceptible of alternative interpretations, it is quite reasonable to view it as an attempt to persuade Dr. Moore either to alter his statements to the IRS or to stop talking to the agency altogether.

Somewhat less clear is whether Anderson's statement was made "during the course" of the conspiracy. This court has recognized that "[t]he duration of a conspiracy . . . depends upon the scope of the agreement entered into by its members" and is, therefore, dependent on the facts in each case. *United States v. Hickey,* 360 F.2d 127, 141 (7th Cir.), *cert. denied,* 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966); *United States v. Nowak,* 448 F.2d 134, 139 (7th Cir. 1971). In addition, in determining whether there has been an agreement to conceal, the Supreme Court has stated that there must be more than "circumstantial evidence showing merely that . . . the conspirators took care to cover up their crime in order to escape punishment." *Grunewald v. United States,* 353 U.S. 391, 402, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957). *See also Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

On the record before us, we find that sufficient evidence existed from which a jury could infer that an agreement to conceal existed at the outset of the conspiracy. First, the indictment alleged and the prosecution proved a broad effort to evade taxes which by its nature required a substantial effort at concealment. *Nowak, supra,* 448 F.2d at 139. Thus, unlike in *Lutwak* and *Krulewitch,* where the object of the conspiracy was a discrete criminal act, here we deal with a crime that had no specific terminating event.[10] Therefore,

---

**9.** Defendant also appears to argue that the question on redirect examination that elicited the hearsay statement was beyond the scope of cross-examination. The general rule is that the scope of redirect examination is a matter firmly committed to the sound discretion of the trial court. *United States v. Hodges,* 480 F.2d 229, 233 (10th Cir. 1973); *Chapman v. United States,* 346 U.S. 383, 388 (9th Cir.), *cert. denied,* 382 U.S. 909, 86 S.Ct. 249, 15 L.Ed.2d 161 (1965). *See also Schutter Candy Co. v. Stein Bros. Paper Box Co.,* 371 F.2d 340, 342 (7th Cir. 1966). Here the district court decided that the subject matter of the cross-examination dealt with meetings between Anderson and Moore without any apparent time limitation. On redirect examination, the prosecution asked about one meeting between Anderson and Moore not specifically raised in cross-examination. The judge certainly did not abuse his discretion by deciding that that line of questioning was appropriate. That the questioning elicited a response that was damaging to defendant does not affect the propriety of the court's decision as to the appropriate scope of redirect examination.

Defendant also asserts that the admission of Anderson's statement to Dr. Moore at the trial violated the defendant's constitutional right under the Fifth Amendment to confront and cross-examine Anderson. The assertion lacks merit. Defendant had the opportunity to cross-examine Dr. Moore as to whether the statement was actually made and the statement, itself, was basically reliable, being a statement against penal interest and not dependent on Anderson's recollection. *See United States v. Cogwell,* 486 F.2d 823, 833–35 (7th Cir. 1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974).

**10.** This case is distinguishable from both *United States v. Flecha,* 539 F.2d 874 (2d Cir. 1976) and *United States v. Floyd,* 555 F.2d 45 (2d Cir. 1977), on the basis that in both decisions the court found an event which terminated the

the nature of the attempted crime by itself provides a substantial inference of agreement to conceal or cover-up.

In addition, there was the evidence of the meeting of the A & D stockholders and the false testimony of Anderson before the grand jury. The successful commission of the crime, rather than its mere concealment from investigation, required that the "investors" true status not be uncovered. Both acts, therefore, could be viewed by a jury as relating back to the decision to evade taxes. Viewing the case in the light most favorable to the government, we conclude that there was sufficient evidence from which a jury could determine that a cover-up of the crime was one of the central objects of the conspiracy as originally conceived. Therefore, the conspiracy continued until the date of the filing of the indictment, and Anderson's statement to Dr. Moore was made "during the course" of the conspiracy.

■ We should note finally in dealing with this issue that, even if we were disposed to conclude that this evidence was inadmissible, we would still hold that its admission was harmless error under Fed.R. Crim.P. 52(a). It was merely a single comment in an eight-day trial that was only directly inculpatory as to Anderson, and not the defendant. Also, there is substantial independent evidence of the defendant's

guilt. *See United States v. Rizzo,* 418 F.2d 71, 79 (7th Cir. 1969), *cert. denied sub nom., Tornabene v. United States,* 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970); *United States v. Fellabaum,* 408 F.2d 220, 226 (7th Cir.), *cert. denied,* 396 U.S. 858, 90 S.Ct. 125, 24 L.Ed.2d 109 (1969). We, therefore, conclude that the admission of Anderson's statement to Dr. Moore is not a sufficient basis for reversal.[11]

## III

■ Defendant's next set of arguments deals with the propriety of the prosecutor's closing argument at the trial. The basis for the defendant's first assignment of error is the prosecutor's comments suggesting, in the defendant's view, that the jury would have to believe that the prosecution suborned witnesses Smith and Dotson to perjure themselves in order to acquit the defendant. Based on this characterization, the defendant argues that no such finding was necessary to acquit, and therefore, concludes that the prosecutor's statement represented a misstatement of the law within the meaning of *United States v. Bohle,* 445 F.2d 54 (7th Cir. 1971), and *United States v. Phillips,* 527 F.2d 1021 (7th Cir. 1975).

Defendant properly cites *Bohle* and *Phillips* for the proposition that a misstatement of law by the prosecutor in a closing argument can be a ground for reversal.[12] How-

conspiracy. In *Flecha,* the court concluded quite reasonably that the arrest of the conspirators ended the conspiracy. In *Floyd,* the court found that the conspiracy had as its sole object the robbing of a bank. Once that object was concluded, the conspiracy terminated. In this case, there is no such single event, and, therefore, we must examine all of the evidence to determine what the jury could reasonably decide the duration of the conspiracy had been.

11. Although defendant's brief is not clear on the point, it appears to argue in a footnote that the duration of the conspiracy cannot exceed the date of the last overt act charged and proved in the indictment. Since the last overt act in this case was Anderson's statements to the grand jury and his statement to Dr. Moore occurred subsequent to the grand jury appearance, the defendant argues that the statement was inadmissible. Defendant's reliance on *Fiswick v. United States,* 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196 (1946), to support his position

is misplaced. In that case the Court held that the last overt act was also the object of the conspiracy, and therefore marked its termination. *Id.* at 216–17, 67 S.Ct. 224. The Court did not purport to establish a rule that the last overt act, of necessity, marks the duration of the conspiracy. In fact, the Court, itself, only stated that the overt acts "may" mark the duration of the conspiracy, and not that they must. *Id.* at 216, 67 S.Ct. 224.

We should also note that defendant later in his brief argued that it was error for the prosecutor in his closing argument to make reference to Anderson's remark to Dr. Moore. Given our holding that the statement was admissible, it is obvious that defendant's argument has become frivolous.

12. This case is readily distinguishable from *Bohle* and *Phillips.* In *Bohle,* the prosecutor told the jury that in its evaluation of the defendant's insanity defense it could properly consider the presumption of sanity. However,

ever, the defendant here seriously exaggerates the nature of the prosecutor's remarks. The prosecutor made no statements of law in his closing argument. All that he did was respond to defense counsel's argument that Smith and Dotson had been induced to testify as they did out of fear of further prosecution. The prosecutor raised the point merely to state that he "resent[ed] it" (Tr. at 1063). There was no statement here, like that repeated several times in *Phillips,* that the jury *had* to find the prosecutor guilty of wrongdoing before it could acquit the defendant. We find no error in the prosecutor's comments on this point.[13]

■ Next, defendant complains that the prosecutor in his closing argument improperly appealed to the pecuniary interests of the jury. This court has held that statements to a jury suggesting some relationship between a defendant's fraudulent activities and the jurors' insurance premiums or taxes is improper and potentially reversible error. *See United States v. Trutenko,* 490 F.2d 678, 679 (7th Cir. 1973); *Epperson v. United States,* 490 F.2d 98, 100 (7th Cir. 1973). However, this is not such a case.

At one point the prosecutor did say, "we recognize our responsibility to the Government to pay our taxes" (Tr. at 1080). However, the comment was in response to defense counsel's argument that two million dollars is a lot of money and that some of the expenditures that were being used as evidence were for the benefit of defendant's son. The prosecutor's argument was intended to dispel any sympathy for the defendant on this point, and not to appeal to the jury's pecuniary interests.

■ Defendant's final assignment of error based on the closing argument is that the prosecutor made an uncalled for reference to the Biblical story of the slaying of Abel by Cain that was included merely for its highly prejudicial effect. During his argument, the prosecutor characterized the defendant's defense as an effort to shift the defendant's responsibility to F. Lawrence Anderson. In so doing, he quoted Cain's statement to God, "I'm not my brother's keeper" (Tr. at 1085). Defendant claims that he never attempted to shift the blame to Anderson in his argument. However, in his closing argument, defense counsel twice suggested that the arrangements for fraudulent shareholders might have been in Anderson's interest rather than the defendant's. He argued:

If Mr. Anderson was working some kind of a plan with . . . Dr. Moore, for example, . . . that is their problem. There's no proof whatsoever that Mr. Mackey had anything to do with that.

If you choose to believe that Mr. Dotson got the twelve thousand dollars, that he . . . invested in A & D from Mr. Anderson, that may be something between them, but you can't hold that against Mr. Mackey.

(Tr. at 1039). In light of these arguments, the prosecutor rightly concluded that defendant was attempting to shift the blame to Anderson. There is no error in presenting his response to this issue in a colorful fashion.

Based on our evaluation of the closing arguments of both the defense counsel and

as a matter of law, the jury was not permitted to consider that presumption. The court held that such a serious misstatement of the law on the central issue to the defendant's case was error. 445 F.2d at 71. There is no comparable misstatement of law in this case.

In *Phillips,* the prosecutor on three separate occasions, and with the approval of the court in the presence of the jury, argued "you're going to have to find, I suppose, that I conspired with the agent to commit this crime by bringing it to you." 527 F.2d at 1022. The court correctly decided on those facts that the jury might reasonably have concluded that it had to find the

prosecutor guilty of misconduct before it could acquit the defendant. The argument to the jury in this case was significantly less likely to mislead the jury.

13. Defendant also argues that the prosecutor's remarks about Dotson and Smith amounted to "placing his personal integrity behind the truthfulness of the witness[es]." *United States v. Phillips,* 527 F.2d 1021, 1023 (7th Cir. 1975). We cannot agree. Nothing in the prosecutor's comments even approaches the defendant's characterization that the argument "amounts to placing the prosecutor in the same conspiratorial nest with the witnesses." *Id.* at 1025.

the prosecutor, we conclude that the district court rightly decided that the prosecutor "in response to defense arguments made—struck hard blows, but he did not strike foul ones" (Tr. at 1090). *See Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). We, therefore, find no error based on the prosecution's closing argument.

### IV

One of the prosecution's witnesses, Artie Jenkins, was asked about the source of $5000 in cash that he had used to attempt to post bail for the defendant before a magistrate in Hammond, Indiana. The prosecution sought to elicit from the witness the fact that he had acquired the money from Gibraltar Insurance Company. Jenkins, however, stated that the money had come from his mother (Tr. at 145). In an effort to impeach this statement, the prosecutor asked if Jenkins had told the magistrate in charge of defendant's bail that the money had come from Gibraltar Insurance Company. Jenkins responded that he could not recall. The prosecutor then asked about other statements that Jenkins made before the magistrate, but he again responded that he did not recall. The prosecution did not attempt to offer into evidence a transcript of the proceedings before the magistrate in order to complete the impeachment.

Defendant claims that the prosecution, having emphasized the witness's comments to the magistrate, had a duty to complete the impeachment and failure to do so was prejudicial error. We disagree with defendant's analysis on both points.

▇▇▇ First, to the extent there is ever a duty to complete an impeachment, it will only arise once the witness categorically denies ever having made the prior inconsistent statement, *United States v. Bohle,* 445 F.2d 54, 73 (7th Cir. 1971), and not when he merely fails to remember whether or not he has made it. Second, even if a duty to impeach had arisen, it is difficult to fathom what harm to the defendant's case attended that error. The witness's testimony was

generally favorable to defendant, the effort at impeachment was modest and the witness's significance to the prosecution's case was de minimis. Under these circumstances, we find no error in the prosecution's conduct.

### V

Defendant argues that the prosecution deceived him by first stating in a bill of particulars that the fictitious bank account alleged in Count II of the indictment was maintained at the Citizens Trust Bank in Atlanta, Georgia and then subsequently proving that the account in fact was kept at the Gary National Bank. We find no basis in defendant's argument for reversal.

Initially, we note that the letter sent to defendant was not a bill of particulars. The district court denied the defendant's motion for a bill of particulars on September 24, 1976, because of the extensive discovery permitted. Therefore, cases cited by defendant dealing with misstatements in a bill of particulars are inapposite.

▇▇▇ There remains the possibility that defendant was sufficiently misled by the representations of the prosecution so that he was deprived of a fair trial. Defendant, in this respect, fails to identify how he was prejudiced by the prosecution's statement. In fact, after the trial below, counsel for the defendant stated, "I did not recall specifically that the letter related to the fictitious bank accounts until I had an opportunity to review it last night in the motel" (Tr. at 1100). This statement seems to belie any reliance by the defendant on the prosecution's letter. We agree with the district court's assessment that "[i]t would appear to me that defense counsel should have known about the M.W.E. & S. account and the Government's contentions in regard to it a long time ago" (Tr. at 1100). The prosecution's possible misstatement did not deny defendant a fair trial.

### VI

Defendant's next two arguments are that the conviction under Count II must be re-

versed because two of the affirmative acts of tax evasion alleged in the indictment were not proved. Defendant asserts that no evidence was presented as to fictitious bank accounts or fictitious mortgages. Defendant is incorrect in his assessment both of the law and the facts surrounding these issues.

 Under 26 U.S.C. § 7201, the prosecution must prove some affirmative act constituting an attempt to evade or defeat the payment of taxes. *Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943); *United States v. Ming,* 466 F.2d 1000, 1004 (7th Cir.), *cert. denied,* 409 U.S. 915, 93 S.Ct. 235, 34 L.Ed.2d 176 (1972). However, the prosecution need not prove each affirmative act alleged. This case seems directly controlled by this court's previous decision in *United States v. Reicin,* 497 F.2d 563 (7th Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974), a mail fraud case involving, as here, several instances of illegal activity guided by a unitary scheme. *Id.* at 569–70. There, the court distinguished a Second Circuit decision, relied on heavily by defendant in this case, *United States v. Groves,* 122 F.2d 87 (2d Cir.), *cert. denied,* 314 U.S. 670, 62 S.Ct. 135, 86 L.Ed. 536 (1941), and held "it is necessary to prove at least one but not necessarily each of the specific acts to sustain each count." 497 F.2d 568. We believe that the court's analysis in *Reicin* applies with equal force here. Since defendant does not contest that there is at least sufficient evidence to prove the other three affirmative acts alleged in Count II of the indictment, we must affirm the conviction on this Count.

We note as an alternative basis for affirming the conviction on this Count that there was sufficient evidence to support a finding that the defendant committed all the affirmative acts alleged. First, defendant asserts that the only fictitious bank account at issue was the one in Atlanta, Georgia. In light of our discussion in part V, *supra,* however, this view is patently incorrect. The M.W.E. & S. account in Gary, Indiana was the basis for the allegation and there was a great deal of evidence as to whether it was a corporate account or merely a personal account of the defendant.

Second, the prosecution demonstrated that mortgages remained on defendant's property long after the debts that created them had been satisfied (Tr. at 479–80, 509, 546). While defendant presents persuasive arguments as to what inferences to draw from this fact, those arguments were for the jury and do not affect the correctness of the district court's decision to let the general allegation be considered by the jury. We, therefore, find no error on these points.[14]

## VII

 Defendant next argues that there was no evidence before the grand jury to support a charge of subornation of perjury (Count III of the indictment), and that the inclusion of such a charge both as a separate count and as a part of each of the other counts in the indictment requires reversal of defendant's conviction. Defendant contends that courts must exercise some supervisory control over grand jury indictments if there is an allegation that there was "no evidence" presented to the

---

**14.** Defendant argues similarly, again relying on *United States v. Groves,* 122 F.2d 87 (2d Cir.), *cert. denied,* 314 U.S. 670, 62 S.Ct. 135, 86 L.Ed. 536 (1941), that his conspiracy conviction must be reversed because the prosecution failed to prove one of the alleged objects of the conspiracy charged in Count I of the indictment, *viz.,* that defendant and F. Lawrence Anderson caused witnesses to testify falsely before the grand jury and at the perjury trial of Carl Smith. First, there was some evidence supporting both general allegations. Second, the prosecution need only prove one object of

the conspiracy, absent undue prejudice created by the evidence presented as to the object not proved. *See United States v. Papadakis,* 510 F.2d 287, 297 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *United States v. Grizaffi,* 471 F.2d 69, 73 (7th Cir. 1972), *cert. denied,* 411 U.S. 964, 93 S.Ct. 2141, 36 L.Ed.2d 684 (1973). Defendant neither contests that the prosecution in fact proved several objects of this conspiracy nor contends that the evidence used to prove the objects at issue here was prejudicial. Therefore, we find defendant's argument without merit.

grand jury to support a given charge. *United States v. Costello,* 221 F.2d 668, 677 (2d Cir. 1955), *aff'd on other grounds,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *Brady v. United States,* 24 F.2d 405, 407–08 (8th Cir. 1928). Assuming, without deciding, that defendant correctly states the law, we nonetheless find no basis in this argument for reversal. Defendant raised this issue before the district court and it stated initially that it has inspected *in camera* several grand jury transcripts and concluded "with all due respect, Counsel, I don't think you are even close" (Tr. at 781). Then, the court overruled defendant's motion for a mistrial based on this argument (Tr. at 782). Nothing in defendant's one-sided summary of the proceedings before the grand jury convinces us that the court below erred in its assessment of the grand jury record. In light of this fact, and defendant's failure to certify the grand jury transcript as part of the record for appeal, we hold there was no error in the district court's decision.

### VIII

■ Defendant's last argument in his initial appeal is that the district court erred in requiring the defendant, pursuant to Fed.R.Crim.P. 17(c), to produce documents without a fuller presentation by the prosecution to support its motion. The court concluded in response to the defendant's motion to reconsider that production of the documents would "expedite the trial in this case." Defendant does not contest that finding. More importantly, defendant fails to allege any prejudice caused by the court's order. We, therefore, find no error.

### IX

■ On his appeal to the district court's denial of his motion for a new trial, defendant raises two arguments. First, defendant argues that the prosecution's failure to provide him with a copy of a transcript of an interview by an Internal Revenue Agent with Carl E. Smith was a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We disagree.

In *Brady,* the Supreme Court held that:

> [T]he suppression by the prosecution of evidence favorable to an accused *upon request* violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. at 87, 83 S.Ct. 1196 (emphasis added). As suggested by the quotation from *Brady,* the narrow issue for us is, given the nature of the defendant's request for exculpatory materials, did the prosecutor have a duty to provide defendant with a transcript of this particular interview? That issue is controlled by the Supreme Court's recent decision in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

The Court in *Agurs* reasoned that two factors define the duty of the prosecutor to provide *Brady* materials: whether the request for those materials was specific or general and their materiality. With regard to a general request, the Court concluded:

> Such a request really gives the prosecutor no better notice than if no request is made. If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor.

427 U.S. at 106–07, 96 S.Ct. at 2399. If the request for *Brady* material is general in nature, the Court held as to the materiality of that evidence that, "the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.* at 108, 96 S.Ct. at 2399.

Applying those standards to the record before us, we conclude that the prosecutor did not violate his constitutional duty to disclose. Here the defendant's request was for "[i]nformation relating to material inconsistencies between statements given by any person, whether or not he is a prospective Government witness, and information relating to material inconsistencies between two or more persons, whether or not they are prospective government witnesses."

Contrary to defendant's contention, we conclude that this request was "general" within the meaning of *Agurs*. At a minimum, we would require that defendant focus his request on a particular witness before we would hold the request to be "specific." Plainly, defendant's request did not give "the prosecutor notice of exactly what the defense desired." *Id.* at 106, 96 S.Ct. at 2398.

Having determined that the request was general, it remains to be determined whether its non-disclosure deprived defendant of a fair trial. That determination is best made by the district court judge, with our review limited to whether his "first-hand appraisal of the record" was "thorough" and "reasonable." *Id.* at 114, 96 S.Ct. at 2402. The court below, after a careful consideration of the requested material and the record at trial, concluded:

> The material presented would have been of a collateral nature. At the very most a small part of the material presented might have been used for impeachment of Carl Smith. However, such would only have been cumulative.

(Order of Sept. 23, 1977, at 12). Given that the omitted evidence was merely additional material for impeaching an already thoroughly impeached witness, we conclude that the district court's assessment was reasonable.[15]

**15.** There is a substantial dispute between the defendant and the prosecution as to whether defense counsel exercised "due diligence" in discovering the relevance of Smith's narcotics interview. It is not exactly clear what role this issue plays in defendant's appeal of the denial of his motion for a new trial. Defendant in his initial brief before this court did not argue that the interview was "newly discovered" evidence. Instead, his arguments were limited to possible violations of *Brady* and the Jencks Act. The prosecution in its brief raised the "due diligence" defense. That analysis, as argued, seems absolutely unrelated to any point raised in defendant's brief. Nonetheless, the defendant responded to the issue in his reply brief; however, he did so within the context of the *Brady* issue. Initially, we conclude that we are not being asked to reverse solely because the interview is "newly discovered" evidence. Second, in light of our view that, regardless of

Second, defendant in this appeal argues that the failure of the prosecution to provide the memorandum of the interview of Carl Smith relating to his narcotics activities was a violation of the Jencks Act, 18 U.S.C. § 3500.[16] Since neither party argued the point, we assume, without deciding, that this was a "statement" within the meaning of 18 U.S.C. § 3500(e)(1). Thus, the key issue is whether the information contained in the interview "relates generally to the events and activities testified to" by Carl Smith. *United States v. O'Brien,* 444 F.2d 1082, 1086 (7th Cir. 1971).

The district court concluded both that the statement did not "relate to" Smith's testimony within the meaning of *United States v. Cleveland,* 507 F.2d 731 (7th Cir. 1974), and that, even if it had, failure to produce that information did not require reversal of the case. *See United States v. Esposito,* 523 F.2d 242, 248 (7th Cir. 1975), *cert. denied,* 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 768 (1976). We find no basis for reversing those determinations. The subject matter of Smith's statement to the IRS agent occurred well before the creation of A & D Realty and it only indirectly reflected on the witness's statement on direct examination that he received money from defendant. In addition, the fact that the witness was promised consideration in return for his cooperation in a completely unrelated narcotics investigation cannot be said to "relate to" his trial testimony in any way.

whether defense counsel exercised "due diligence," there is no violation of *Brady* and *Agurs* on this record, we decline to consider the possible effect of that factor either for or against the defendant. *Compare United States v. Hedgeman,* 564 F.2d 763 (7th Cir. 1977) *with Marshall v. United States,* 141 U.S.App.D.C. 1, 436 F.2d 155 (1970).

**16.** That section provides in relevant part:
> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500.

We, therefore, find no violation of the Jencks Act requiring reversal of defendant's conviction.

For these reasons, the judgment of conviction entered by the district court on January 14, 1977, and the judgment denying the defendant's motion for a new trial entered September 23, 1977, are affirmed.

AFFIRMED.